STATE

v.

**Stephen R. MATTATALL.**

No. 85–149–C.A.

Supreme Court of Rhode Island.

May 11, 1987.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Joel S. Chase, Asst. Attys. Gen., for plaintiff.

William Reilly, Public Defender, Janice M. Weisfeld, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on a remand order from the Supreme Court of the United States directing that we reconsider our previous opinion in *State v. Mattatall*, 510 A.2d 947 (R.I.1986), in the light of *Kuhlmann v. Wilson*, —— U.S. ——, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). The nature of the remand order is such that we are directed to reconsider only one aspect of our opinion, namely, the question of whether the defendant's Sixth Amendment right to counsel was violated by the police in listening to telephone conversations between the defendant and John Carney relating to the death of the victim, John Scanlon. The facts of the case insofar as they relate to the telephone conversations were as follows.

Carney contacted the Warwick police department and complained that he had received threatening telephone calls from defendant, Stephen R. Mattatall. As a result of this complaint, members of the Warwick police department went to Carney's home. While the police were at his home on December 26 and 27, 1982, Carney, in anticipation that he might receive more threatening calls, asked the police to listen on an extension whenever the telephone rang. While the police listened, three calls were received from defendant, one on December 26 and two on December 27.[1] Carney testified that during the December 26 conversation he did not raise the question of Scanlon's death. His testimony regarding the two conversations that took place on December 27 was, however, quite different. Carney unequivocally testified that during the first conversation at approximately 10:20 a.m. he initiated the reference to Scanlon. The death was discussed and defendant indicated that it was an accident. Carney also testified that during the second conversation at 11:33 a.m. he again raised the matter of Scanlon's death and suggested that friends and family as well as Carney did not think that defendant had killed Scanlon. After some further equivocal conversation on this matter, Carney pressed the issue further and elicited information that no one other than defendant and Scanlon were in the house the night Scanlon died. He then posed the question, "You mean Scanlon shot himself?" and defendant replied in the negative.

In the light of Carney's uncontradicted and unimpeached testimony during the suppression hearing, we must disagree with the factfinding by the trial justice that it was defendant who brought up the Scanlon death. Whereas this might have been true of the first conversation, it was a clearly erroneous finding in regard to the second and third conversations, in which Carney definitely raised the issue and pressed for further information.

---

1. In our previous opinion, the telephone conversations were inadvertently stated to have occurred on December 26 and 27, 1983, instead of December 26 and 27, 1982.

The trial justice found that the role of the police was entirely passive. It is undisputed, however, that the police had come to the Carney home in order to investigate alleged threats from defendant. It is also undisputed that while the police were in the Carney home, they, with Carney's consent, listened on an extension to at least three telephone calls that Carney received from defendant.

In our previous opinion we held that this activity by the police was a violation of defendant's Sixth Amendment right to counsel. We noted that the parties had stipulated that prior to these telephone calls defendant had been arraigned on the charge of homicide and that counsel had appeared to represent him. We also observed from the evidence in the case that the police officers who listened in on the conversations were aware of the pending homicide charges against defendant.

We believe that the recent decision of the Supreme Court in *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), is controlling on the issues raised by the Carney conversations. We concede that the distinctions drawn by the Supreme Court of the United States during the course of its elucidation of the *Massiah* doctrine are extremely subtle and may often elude the most careful analysis. However, it is the role of state courts as well as lower federal courts to attempt, as best they may, to thread their way through this maze of fine distinctions.

In *Moulton*, a codefendant named Colson (who was unrelated to the Colson in the *Massiah* case) notified the police that he had received anonymous threatening telephone calls regarding the charges pending against him and Moulton. At subsequent meetings with the police, Colson not only fully confessed to his participation with Moulton in the crimes for which they had been indicted, but also gave the police information about other crimes that he and Colson had committed. In exchange for his cooperation and testimony against Moulton in the prosecution of the pending charges, the police offered not to bring further charges against Colson. The police

requested, and Colson consented, to have a recording device placed on Colson's telephone. Over a period of more than one month, three conversations were recorded. During one of these conversations, Moulton asked Colson to meet in person to plan a joint defense. With Colson's consent, the police equipped Colson with a body-wire transmitter to record the conversation at this meeting. During the meeting a great deal of incriminating material was elicited by Colson's inquiries and requests of Moulton to provide him with details of the original crime.

After a careful review of *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); and *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the Court rejected arguments that the Sixth Amendment right to counsel is violated only when the police set up the confrontation between the accused and a police agent. The Court found immaterial that Moulton rather than Colson initiated the recorded telephone conversations and requested the critical meeting. On these issues Justice Brennan, speaking for a majority, observed:

"In the first place, the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in *Massiah* or *Henry*. Thus, while in *Massiah* it may have been the Government agent who was responsible for setting up the meeting with the defendant, one discovers this only by looking to the opinions of the Court of Appeals. It is not mentioned in this Court's opinion since the issue of who set up the meeting with whom was not pertinent to our disposition. Moreover, four years after *Massiah*, the Court summarily reversed a conviction where the defendant requested the meeting and initiated and led the conversation in which incriminating statements were made to an undercover informant. *Beatty v. United States*, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) (*per curiam*). In that case, the Solicitor

General made the same argument that he and the State make today; * * * we rejected this argument in an opinion that simply cited *Massiah*. Finally, in *Henry*, we deemed it 'irrelevant that in *Massiah* the agent had to arrange the meeting between Massiah and his codefendant while here the agents were fortunate enough to have an undercover informant already in close proximity to the accused.'" *Moulton*, 474 U.S. at ——, 106 S.Ct. at 486–87, 88 L.Ed.2d at 495–96 (quoting *United States v. Henry*, 447 U.S. 264, 272 n. 10, 100 S.Ct. 2183, 2187 n. 10, 65 L.Ed.2d 115, 123 n. 10 (1980)).

The Court further held immaterial the fact that the law enforcement officials were investigating an individual for the commission of crimes separate and distinct from the crime for which he was charged. *Moulton*, 474 U.S. at ——, 106 S.Ct. at 489, 88 L.Ed.2d at 498. We suggest that the fact in the case at bar that the police were present in the Carney home because of possible threats from defendant (which actually did not arise) was equally noncontrolling.

We begin our consideration of the effect of *Kuhlmann v. Wilson*, —— U.S. ——, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), with an analysis of the facts in that case as well as the posture in which it was presented. It should be noted that *Kuhlmann* was a successive petition for habeas corpus that raised an issue previously decided adversely to Wilson by the Court of Appeals for the Second Circuit in *Wilson v. Henderson*, 584 F.2d 1185 (2d Cir.1978). The first and purportedly dispositive holding of a plurality of the Supreme Court in *Kuhlmann* was that this successive petition should not have been entertained by the Court of Appeals since there was no allegation or indication that Wilson had been wrongfully convicted of a crime that he did not commit. Because the constitutional claim argued by Wilson did not raise any question concerning his guilt or innocence, the petition should have been dismissed. *Kuhl-*

mann, —— U.S. at ——, 106 S.Ct. at 2628, 91 L.Ed.2d at 382.[2]

Nevertheless, after this plurality holding, the Court went on to analyze the *Massiah* claim of Sixth Amendment violation in the light of *United States v. Henry*. The Court distinguished *Henry* on the ground that in the *Henry* case the jailmate informant was a paid informant who did more than merely listen. The Court pointed out that in *Henry* the Court of Appeals had found that although the informant had not questioned the defendant, he had stimulated conversations with the defendant in order to elicit incriminating information.

Justice Powell, writing for a majority in *Kuhlmann*, held that the findings of the state court conclusively established that the police officer had instructed Wilson's cellmate, Lee, "only to listen to [Wilson] for the purpose of determining the identities of the other participants in the robbery and murder." *Kuhlmann*, —— U.S. at ——, 106 S.Ct. at 2630, 91 L.Ed.2d at 385. The police already had solid evidence of Wilson's participation. Justice Powell also noted that the state court further found that Lee followed those instructions, that he at no time asked Wilson any questions concerning the pending charges, and that he only listened to Wilson's spontaneous and unsolicited statements. *Id.*

In the case at bar this court has determined from the uncontradicted and unimpeached testimony of the witness Carney that he asked questions of defendant and then pressed him for clarification of his equivocal responses. We have held that the trial justice's finding to the contrary was not supported by the record in respect to the two conversations on December 27. We have thus held the trial justice's finding on this issue to be clearly erroneous. As a consequence, the analysis of *Kuhlmann*, when applied to the facts of the case at bar, leads us to the conclusion that the role of the informant here was not one of mere passive listener and therefore would be controlled by the doctrine enunciated in

**2.** The positions taken by Justices White and Blackmun on the habeas issue are somewhat less than clear, since they concurred in the judgment and the Sixth Amendment issue but neither concurred nor dissented on the habeas issue.

*Moulton* and applied by us in our initial opinion.

Therefore, we again conclude that the admission of incriminating statements made by defendant during his two later conversations with Carney was erroneous and prejudicial. Admission of such statements, whether through the police or Carney himself, would constitute a violation of defendant's Sixth Amendment right to counsel.

In our previous opinion we held that a new trial was required because of the violation of defendant's Fourth Amendment right to be free from seizure in the absence of probable cause and that the fruits of such illegal seizure were inadmissible into evidence. *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The direction for reconsideration from the Supreme Court of the United States did not deal with this issue, and therefore we need not reiterate the basis for this holding. However, the state argues with great emphasis that we did not find (nor did the trial court find) that there was an absence of probable cause. We did state in our prior opinion that "the court must assume that at the time Mattatall was ordered to be transported to Warwick police headquarters, the police had insufficient evidence to constitute probable cause to believe that defendant was responsible for the homicide, or indeed that a homicide had been committed. Their purpose in transporting Mattatall to the police station was investigative only. They did not suspect him of homicide or murder." *State v. Mattatall*, 510 A.2d at 950.

The assumption that this court made was based upon the evidence that had been presented at the trial. There was no suggestion that probable cause had been established. The trial justice based his admission of the challenged evidence on a finding that no arrest had taken place. We held that the trial justice's finding that these statements were voluntary for Fifth Amendment purposes was insufficient to overcome the Fourth Amendment violation.

We emphasize in this opinion that on the evidence contained in the record presented to us on appeal, no finding that probable cause existed could have been sustained. In order to allay any confusion on the part of the prosecution, we now state unequivocally that the record was barren of evidence that would have established probable cause for the seizure of the defendant, Mattatall, at the time he was transported to Warwick police headquarters for investigative purposes. This assertion is consistent with our statement in the first opinion: "[T]herefore, this court must conclude as a matter of fact that Mattatall was brought involuntarily to the police station for interrogation even though the police did not suspect him and had no probable cause to believe that he was guilty of a crime." *State v. Mattatall*, 510 A.2d at 950.

For the reasons stated, we reaffirm our original holding that vacated the defendant's conviction. The papers in the case are remanded to the Superior Court for a new trial.