**STATE**

v.

**William BURKE and Kelly Crosby.**

No. 86–180–C.A.

Supreme Court of Rhode Island.

July 27, 1987.

James E. O'Neil, Atty. Gen., Annie Goldberg and Thomas Dickinson, Asst. Attys. Gen., for plaintiff.

Daniel McKinnon, McKinnon & Harwood, Pawtucket, for Burke.

William Reilly, Public Defender, Paula Rosin, Barbara Hurst, Asst. Public Defenders, for Crosby.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal by the defendants William Burke and Kelly Crosby from judgments of conviction entered after a jury trial in the Superior Court. The defendants Burke and Crosby were found guilty of seven counts of robbery, and one count of assault with intent to rob. Burke was also convicted of carrying an unlicensed pistol. We affirm.

On December 20, 1982, two armed men wearing masks and gloves entered Foley's Lounge in Cumberland, Rhode Island, robbed several patrons and employees of the bar, and fled. Shortly thereafter, defendants Burke and Crosby were arrested and charged in connection with the robbery. Two employees of the lounge recognized the voice of one of the robbers as that of defendant Burke, a regular patron of Foley's Lounge. A witness at trial testified that defendants Burke and Crosby admitted their involvement in the Foley's Lounge robbery in the course of asking him to retrieve for them certain evidence connecting them with the crime. The defendants raise a number of issues on appeal. Additional pertinent facts will be set forth as is necessary to further the discussion of each issue raised.

## I

## RULE 48(b) MOTION

Both defendants assert that a Superior Court justice clearly abused her discretion in denying their Rule 48(b) motions to dismiss their indictments for lack of speedy trial. The defendants were arraigned on March 7, 1983. Their motions for new trial were heard and denied on September 17, 1984. Eighteen months, therefore, elapsed between the time defendants were indicted and the denial of their Rule 48(b) motions. A trial of the case commenced in September of 1984 but resulted in the declaration of a mistrial. The case was not tried to its conclusion until June, 1985.

The state suggests in its brief that Rule 48(b) of the Superior Court Rules of Criminal Procedure is inapplicable to the case at bar because the rule was repealed prior to defendants' trial in 1985. We disagree. Rule 48(b) was repealed by a Superior Court order dated June 17, 1982, and approved by order of this court dated November 21, 1984. The rule, therefore, was in effect when defendants' speedy trial motions were heard and decided on September 17, 1984.

In *State v. Borges*, 519 A.2d 574 (R.I. 1986), we held that a defendant's case could not be dismissed under Rule 48(b) when that defendant's motion to dismiss was not filed until after the rule was repealed. In so doing, we held that repeal of the rule did not violate constitutional prohibitions against ex post facto laws. *Id.* at 576. Similarly, in *State v. Nordstrom*, 529 A.2d 107 (R.I. 1987), we determined that dismissal under Rule 48(b) was not an available remedy when repeal of the rule preceded a hearing on the motion to dismiss. In this case, however, the Rule 48(b) motion was fully litigated and decided prior to repeal of the rule. Because defendants' motions were heard and ruled upon prior to the repeal of Rule 48(b), this case continues to be governed by the rule. *See State v. Fenner*, 503 A.2d 518, 523 n.1 (R.I. 1986); *State v. Boss*, 490 A.2d 34, 35 n.2 (R.I. 1985).

The defendants assert that the justice was clearly wrong in denying their motions to dismiss on the ground of "unnecessary delay." We disagree. Rule 48(b) vests great discretion in the trial justice, and this court will not disturb a decision rendered under the rule absent a clear showing of abuse. *E.g., State v. Long*, 488 A.2d 427 (R.I. 1985); *State v. Brown*, 486 A.2d 595 (R.I. 1985); *State v. Macaskill*, 475 A.2d 1024 (R.I. 1984). The defendants argue, and we agree, that delay resulting from the fact that defense counsel is engaged in the trial of another matter, is not delay properly attributable to a criminal defendant. *See State v. Anthony*, 448 A.2d 744 (R.I. 1982). The responsibility for conflicting trial engagements should not be borne by a defendant since neither the defendant nor his counsel have control over trial schedul-

ing. *Fenner*, 503 A.2d at 523; *Anthony*, 448 A.2d at 750.

Even if we were to determine, however, that court scheduling constituted the sole reason for delay in this case and that no portion of the delay was, therefore, properly attributable to defendants, we cannot say that the justice abused her discretion in declining to dismiss the indictments under Rule 48(b). We have stated that delay occasioned by the fact that a defendant's counsel was engaged in another trial is a neutral event for which neither the defendant *nor the state* is responsible. *Fenner*, 503 A.2d at 523. Rule 48(b) applies only to "unnecessary" delays. Delays attributable to conflicting trial engagements are not "unnecessary" within the meaning of Rule 48(b). Indeed, the very nature of the judicial process contemplates delays which arise due to conflicts in court scheduling since nearly all counsel are, at any given time, responsible for the representation of more than one client and the scheduling of cases for trial may not always accommodate the schedules of the trial attorneys. Conflicting engagement of counsel is perhaps the most intractable problem encountered in the assignment of cases, both civil and criminal. In every jurisdiction the trial bar, and particularly the criminal trial bar, consists of relatively few attorneys (including public defenders) who represent a great many clients. *See generally* Barratt, *Criminal Justice: The Problem of Mass Production*, in The Courts, The Public and The Law Explosion 85 (Harry W. Jones ed. 1965); Rosenberg, *Court Congestion: Status, Causes and Proposed Remedies*, In The Courts, The Public and The Law Explosion (Harry W. Jones ed. 1965). We take judicial notice of the well known fact that in Rhode Island the criminal trial bar, including trial lawyers on the staff of the Public Defender and Attorney General, consists of less than 100 persons (out of a total of more than 3000 lawyers). In Providence and Bristol counties alone, 3,181 felony cases were disposed during 1986. In Kent county, 677 felony cases were disposed. Throughout all counties, 4,368 felony cases were filed during this period. *See* Court Statistics: A Quarterly Management Report 2–3 (December 1986). These figures illustrate the fact that a relatively small number of attorneys, both prosecutorial and defense, are required to participate in the processing of a very large number of cases. Until a method is devised to solve the problem of conflicting engagements, delays in scheduling are and will be a necessity and an unavoidable attribute of the judicial system. Consequently, delays resulting from conflicting engagements cannot be termed "unnecessary" for purposes of applying Rule 48(b). The motion justice, therefore, did not abuse her discretion in denying defendants' motion to dismiss for unnecessary delay.

## II

### THE TESTIMONY OF DENISE LAMOUREUX

The defendants both argue that a Superior Court justice erred in declining to suppress the testimony of Denise Lamoureux concerning conversations that she had with both defendants on November 4, 1984. Ms. Lamoureux had been present during the robbery which took place on December 20, 1982. At that time she recognized the voice of one of the robbers as that of William Burke. She also recognized his profile under a stocking mask that he wore.

On October 29, 1984, Ms. Lamoureux was working as a waitress at the St. James Hotel in Woonsocket. She was approached by Burke who asked her whether she knew that he was one of the robbers at Foley's Lounge. He then ended the conversation by saying, "Well, you do what you have to do and I will do what I have to do." Burke then proceeded to watch her from the far end of the lounge for the rest of the evening.

After reflecting on this conversation for a couple of days, Ms. Lamoureux went to the Woonsocket Police and told them that she was in fear of going to work and didn't know what to do. Officer Gordon Tempest suggested that she go to work, but that she wear a sound transmitter while working. The transmitter would be monitored by policemen in plainclothes. The next Fri-

day, Ms. Lamoureux went to work and was approached by both defendants Crosby and Burke. She stated to Crosby, "My gripe is not with you. It is with Billy and if I talk to somebody, it is going to be him." Burke was behind her and came over at Crosby's signal. Ms. Lamoureux asked Burke what he meant by the statement, "You do what you have to do and I will do what I have to do." Burke responded that she had no reason to be afraid of him. He then asked her how much money she had lost in the robbery. The following colloquy ensued as set forth in Ms. Lamoureux's testimony at the trial.

"A. I said, 'One hundred dollars.' It wasn't the same. I said one hundred dollars.

"Q. After you said that, did he say something?

"A. He said, 'I will give you two hundred dollars if you forget you heard my voice.'

"Q. Did he say, 'My voice.'?

"A. 'If you forget you heard my voice.'

"Q. Did he say, 'My' or did he use his name?

"A. He used his name.

"Q. What do you remember exactly what he said, Miss Lamoureux in reference to the money?

"A. All he said was, 'I will give you two hundred dollars to forget you heard Billy Burke's voice that night.' And then I didn't say nothing and he proceeded to offer me three hundred, four hundred and five hundred dollars."

It should be noted that the recording of Ms. Lamoureux's conversation was not used, although she did use the transcript of the recording in order to refresh her recollection. The testimony that she gave in court was her own testimony unassisted by and unsupplemented by the recording that had been made.

Both defendants assert that the use of this testimony violated principles enunciated by the Supreme Court beginning with *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and further elucidated more recently in *United States v. Henry*, 447 U.S. 264, 100 S.Ct.

2183, 65 L.Ed.2d 115 (1980), and most recently, in *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

In *Massiah*, the Court determined that federal agents had violated the defendants' Sixth Amendment right to counsel when they arranged with a codefendant to record a conversation in the codefendant's car during the course of which Massiah made incriminating statements. The Court held that these statements were inadmissible at trial. In *Henry*, the Court reached an identical result when federal agents arranged with a cellmate (who was employed on a piecework compensation basis) to engage Henry in conversation about a robbery with which he was charged. The deliberate elicitation and use at trial of such information in the absence of Henry's counsel was held to be a violation of his Sixth Amendment right. In *Moulton*, the wiring of a codefendant's telephone by police after alleged threats by Moulton resulted in the recording of three conversations. During one of these conversations Moulton asked his codefendant to meet and plan a joint defense. With the consent of the codefendant, police equipped him with a body wire transmitter to record the conversation at the meeting. During the meeting incriminating statements were elicited by the codefendant from Moulton who provided details of the original crime. Even though the motivation of the police was to investigate a complaint of threats, the Court held that it was constitutionally impermissible to use incriminating statements made in the absence of counsel by pre-arrangement with a codefendant.

This court implemented the principles set forth in *Moulton*, *Henry*, and *Massiah* recently in *State v. Mattatall*, 525 A.2d 49 (R.I.1987), in which the police by pre-arrangement recorded telephone conversations made by the defendant to one John Carney. The recording of the conversations was also motivated by alleged threats made by the defendant to Carney. Although the telephone conversations produced no evidence of threats, Carney, by questioning the defendant, elicited certain in-

criminating statements which were used against Mattatall at trial.

The common thread of all of the foregoing cases is that the police or federal agents in each instance deliberately elicited information with the clandestine cooperation of an informant that incriminated a defendant who had been charged with a crime, either by indictment or formal judicial proceedings, and whose counsel had either been retained or appointed to represent him. The Court held in each case that the codefendant or informant had done more than passively listen. *Cf. Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (wherein the mere passive listening by a cellmate, without more, did not violate the Sixth Amendment right to counsel).

In any event, the rationale underlying the cases appears to be that when the right to counsel attaches to a defendant formally accused of a crime, the police are inhibited from utilizing codefendants, cellmates, or other persons who are in a confidential relationship with the defendant in order to draw incriminating information from him, in the absence of his counsel who presumably has a right and a duty to assist and protect the defendant from any such surreptitious interrogation. In the case at bar, however, we are confronted with a novel proposition not encountered in any of the cases to which reference has been made. Here defendants had been accused by Ms. Lamoureux of an implicit threat to a witness. Tampering with a witness, like planning to utilize perjured testimony, is not a matter in which counsel may be called upon to assist.

In *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), the defendant asserted a violation of his right to effective counsel by reason of the fact that his attorney declined to allow him to use perjured testimony at his trial. In fact, the attorney advised Whiteside that if he did testify falsely, it would be counsel's duty to advise the court that the defendant was committing perjury. Thus, Whiteside asserted that he was forced to modify his anticipated testimony as a result of his counsel's threat to expose his perjury. Surprisingly, the Court of Appeals of the Eighth Circuit agreed with Whiteside and held that even the communication of an intent to commit perjury did not alter a defendant's right to effective assistance of counsel, and that counsel's threatened violation of his client's confidence did not comport with the effective representation standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

On certiorari, however, the Supreme Court of the United States, through Chief Justice Burger, for the first time delineated and articulated a lawyer's ethical duty in the face of a communicated intent to commit perjury. The Court stated unequivocally that one who intends to commit perjury is not entitled to either the assistance or protection by confidence of his counsel in furthering such proposed enterprise. The Court observed:

"Similarly, we can discern no breach of professional duty in Robinson's admonition to respondent that he would disclose respondent's perjury to the court. The crime of perjury in this setting *is indistinguishable in substance from the crime of threatening or tampering with a witness or a juror. A defendant who informed his counsel that he was arranging to bribe or threaten witnesses or members of the jury would have no 'right' to insist on counsel's assistance or silence.* Counsel would not be limited to advising against that conduct. An attorney's duty of confidentiality, which totally covers the client's admission of guilt, does not extend to a client's announced plans to engage in future criminal conduct." (Emphasis added.) *Nix v. Whiteside,* 475 U.S. at ——, 106 S.Ct. at 998, 89 L.Ed.2d at 139.

■ It should be noted that in stating that a defendant had no right to the assistance of counsel in committing perjury, the Court equated such a plan with an intention to threaten or tamper with a witness or a juror. In that situation, as in the design to commit perjury, the defendant has no right to rely upon counsel's assist-

ance or silence. In the case at bar, the police were not seeking incriminating evidence per se, but were seeking to expose the attempt by at least one of the defendants to intimidate or persuade a witness against testifying for the prosecution. Neither defendant had any right to expect silence, cooperation, or assistance from Ms. Lamoureux. She had been a victim of a crime which they were accused of having committed. She was in an adversary relationship to both. If defendants or either of them had communicated to their respective counsel their plan to tamper with or intimidate a witness, they would have been entitled neither to counsel's assistance nor silence.

Consequently, in embarking upon this enterprise defendants divested themselves of the protection of the Sixth Amendment right to counsel. It should be noted that no information was obtained from Crosby save his assistance in beckoning to defendant Burke. No information was obtained from Burke except his consciousness of guilt by offering to bribe Ms. Lamoureux to forget that she heard his voice during the commission of the crime. This was a classic case of tampering with a witness.

Witness tampering like perjured testimony tends to subvert the entire judicial process and its principle function of ascertainment of the truth. When a defendant in a criminal case chooses to subvert this process, which is at the core of all liberties, he may forfeit otherwise applicable constitutional safeguards. *See Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). Unfortunately for defendants in this case, testimony concerning witness tampering was directly admissible and relevant in order to show on their part a consciousness of guilt. *State v. Payano,* 528 A.2d 721, (R.I.1987); *see People v. Perez,* 169 Cal. App.2d 473, 337 P.2d 539 (1959); *State v. Graves,* 301 So.2d 864 (La.1974); *State v. Pierce,* 474 A.2d 182 (Me.1984); *People v. Hooper,* 50 Mich.App. 186, 212 N.W.2d 786 (1973); *State v. Reuschel,* 131 Vt. 554, 312 A.2d 739 (1973).

We are, therefore, of the opinion that the justice who heard the motion to suppress testimony of Denise Lamoureux concerning attempts by defendants to persuade her not to testify in their trial did not err in declining to grant defendants' motion to suppress.[1]

## III

### REFERENCES TO DEFENDANTS' INCARCERATION

Defendant Crosby asserts that the trial justice erred in denying his motion in limine to preclude reference to the fact that he was incarcerated in the Adult Correctional

---

**1.** Justice Murray suggests in her dissent that the determination of this issue is inconsistent with our opinion in *State v. Mattatall,* 525 A.2d 49 (R.I.1987), and with *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). On the contrary, we believe that this case is not controlled by either of the foregoing decisions.

In *Maine v. Moulton,* it is true that the initial police investigation at the insistence of codefendant Colson concerned threats made against Colson and a plan to eliminate one Gary Elwell, a key prosecution witness in the forthcoming trial of Colson and Moulton. It is significant, however, that the evidence introduced against Moulton did not include "the portion of the meeting during which Moulton and Colson discussed the possibility of killing witnesses * * *." 474 U.S. at ——, 106 S.Ct. at 483, 88 L.Ed.2d at 490. Thus, no evidence concerning direct witness tampering was introduced or considered by the Supreme Court.

To the same effect in *State v. Mattatall,* John Carney was not a witness, nor was evidence of witness tampering considered in that opinion. Carney simply pressed Mattatall for information concerning Mattatall's part in the homicide death of John Scanlon. No question was raised concerning witness tampering in any conversation in that case.

This is a case of first impression involving a direct attempt by at least one of the defendants to persuade a prosecution witness not to testify. Moreover, the witness testified directly to this event. No tape or recording of the conversation was used. Such evidence is directly admissible as pointed out heretofore in the opinion and deals with an aspect of defendants' activities in which they are not entitled to the Sixth Amendment assistance of counsel as pointed out in *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Thus as demonstrated in the body of the opinion, our decision here is not inconsistent with either *Moulton* or *Mattatall.*

Institutions (ACI). Defendant Burke claims as error the trial justice's failure to inform the jury that he was incarcerated only because he was being held for lack of bail.

At trial, the state presented the testimony of John Eddy who, along with defendants Burke and Crosby, was incarcerated at the ACI in January, 1985. Eddy testified that while at the ACI, defendants approached him, admitted their involvement in the Foley's Lounge robbery, and, believing that Eddy would be released soon, attempted to enlist his aid in disposing of evidence left near the scene of the crime.

The motions in limine were first made prior to the commencement of defendants' first trial.[2] In denying the motions, the justice stated that "to prohibit all references to the ACI would make that testimony virtually meaningless." She further observed that Eddy's testimony wouldn't make any sense at all unless it was made known that defendants were confined in prison and were therefore unable to perform the act they requested Eddy to do for them.

Prior to defendants' second trial, defendant Crosby pursued the motion in limine made at the first trial. Defendant Burke, however, modified his motion to a request that the trial justice inform the jury that he was only incarcerated at the ACI because he was unable to make bail. The trial justice stated that he would tell the jury that Burke was at the ACI for lack of bail but neglected to do so. In considering defendants' requests, the trial justice noted the relevance of the fact that the ACI was the situs of the conversation between Eddy and defendants.

■ Burke asserts that the trial justice's failure to issue a cautionary instruction explaining the reason for his incarceration constitutes prejudicial error. Burke does not assert, however, that the trial justice refused at any time to give such an instruction, nor does he indicate at what point in the proceedings the instruction should have been given. At no time after his initial request for a cautionary instruction did counsel raise the issue. It seems clear that the trial justice simply forgot to give the instruction and counsel failed to remind him. It is a well-settled rule of appellate practice that this court will not review objections that were not raised at trial. *E.g., State v. Long,* 488 A.2d 427 (R.I.1985); *State v. Rondeau,* 480 A.2d 398 (R.I.1984); *State v. Robalewski,* 418 A.2d 817 (R.I. 1980). Claims of error, although briefed and argued at the appellate level, are deemed to have been waived if not effectively raised at trial. *State v. Rondeau,* 480 A.2d 398 (R.I.1984); *State v. Byrnes,* 433 A.2d 658 (R.I.1981); *State v. Duggan,* 414 A.2d 788 (R.I.1980). Since defense counsel failed to object at trial to the trial justice's omission of the agreed upon cautionary instruction, it is deemed to be waived and does not, therefore, merit our consideration.

■ We now turn to defendant Crosby's contention that the motion justice erred in denying his motion in limine to preclude any reference in the course of John Eddy's testimony to the fact that Crosby was incarcerated in the ACI. In *State v. Pugliese,* 117 R.I. 21, 362 A.2d 124 (1976), we reversed a conviction because a witness made a statement implying that the defendant had been confined at the ACI. In that case, however, we determined that the reference to the defendant's incarceration required reversal because the reference was both irrelevant and prejudicial. In this case, the fact that defendants were incarcerated at the time of their conversation with John Eddy was highly relevant to the credibility of Eddy's testimony. Without knowledge of defendants' incarceration and, therefore, their inability to retrieve the evidence themselves, the jury would find Eddy's story that defendants asked him to retrieve the evidence for them highly improbable. Eddy's testimony is believable only when the conversation he had with defendants is placed within its proper context.

In *State v. Cline,* 122 R.I. 297, 405 A.2d 1192 (1979), we held that evidence of a defendant's incarceration at and escape from the ACI was not improperly admitted

---

**2.** The first trial ended in the declaration of a mistrial.

because of its relevancy in clarifying the facts of the case and in establishing a necessary element of one of the crimes charged. *Id.* at 331–32, 405 A.2d at 1210–11. We emphasized that "[t]he state is entitled in any criminal prosecution to present all evidence to the jury which is relevant to the charge." *Id.* at 330, 405 A.2d at 1210. The prejudicial effect that may arise from the jury's knowledge of a defendant's incarceration results from the likelihood that the jury will infer that the defendant is incarcerated as a result of previous criminal activity and is thus possessed of a general criminal disposition. For this reason, the gratuitous injection of the fact that a person has been incarcerated is forbidden because it is not only prejudicial but irrelevant. When, however, as in this case, the fact of a defendant's incarceration is highly relevant to the prosecution's proof of guilty knowledge, intent, motive, design, plan, scheme, system, or the like, its admission is proper. *See State v. Cardoza,* 465 A.2d 200 (R.I.1983); *State v. Whitman,* 431 A.2d 1229 (R.I.1981); *State v. Delahunt,* 121 R.I. 565, 401 A.2d 1261 (1979).

Although we have stated that knowledge of a defendant's incarceration may have a serious prejudicial influence on members of the jury, *State v. Fenner,* 503 A.2d 518 (R.I.1986); *State v. Correra,* 430 A.2d 1251 (R.I.1981); *State v. Pugliese,* 117 R.I. 21, 362 A.2d 124 (1976), the prosecution is not required to engage in inherently incredible circumlocution in order to protect a criminal defendant. In fact, "no doctrine in the law * * * is designed to insulate defendant from relevant truths, even if such truths might lead the jury to draw less favorable inferences concerning defendant than if they were not exposed." *State v. Cline,* 122 R.I. at 331, 405 A.2d at 1210; *see State v. Diaz,* 521 A.2d 129 (R.I. 1987). Since in this case evidence of defendants' incarceration was relevant to the circumstances testified to at trial, its admission into evidence was not erroneous.

## IV

### TESTIMONY READ BACK TO JURY

The defendants contend that the trial justice erred in declining to have portions of the cross-examination of Ms. Lamoureux read back to the jury in response to the jury's request to hear a specific portion of that witness's testimony. During the course of its deliberations, the jury sent out a note which read as follows:

"Want initial testimony of Denise Lamoureux to determine which robber, Number one or Number two said this is a stick-up and testimony regarding contact with Burke and Crosby and the St. James on 10/29 and 11/4. Number two, Flo Bell's entire testimony regarding Duff's Cafe and (3) entire testimony of William Daly. * * * Judge Bourcier, may we please hear the above testimony? Signed, * * *, Foreman of the Jury."

After the requested testimony was read to the jury, counsel for defendant Burke made the following statement:

"I would suggest to the Court that I am not suggesting the stenographer didn't read it, perhaps I didn't hear it and I would ask the other people in the Court there was a question on my cross-examination of Denise Lamoureux that dealt with the seventy-five dollars and the one hundred dollars and dealt with her at an attempt of impeachment by her admission of lying previously and I do not believe that portion of the cross-examination dealing with the money and the lying was read to the jury."

In response, the trial justice noted that he was satisfied that the stenographer read to the jury the testimony it requested. We agree.

The defendants cite *State v. Dame,* 488 A.2d 418 (R.I.1985), in support of their position that the trial justice erred in not ordering the testimony referred to by defense counsel read back to the jury in response to its above-cited request. *Dame,* however, involved a situation which differs significantly from that with which we are currently confronted. In *Dame,* the jury inquired about a fire chief's testimony regarding the time a fire started. The trial justice, in response, read the jury her own notes summarizing only the direct examina-

tion testimony of the fire chief with respect to that issue. She declined to read to the jurors cross-examination testimony that pertained directly to the accuracy of the fire chief's estimate of the time the fire started. This court, therefore, held that the trial justice erred in her omission of cross-examination testimony pertaining to the subject matter of the question. *Id.* at 423–24.

■ In this case, the jury asked for the "initial testimony" of Ms. Lamoureux concerning a specific point of that testimony. The omitted cross-examination testimony pertained not at all to that point, but instead bore only on the question of the witness's credibility in general. Since the testimony that defendants assert was erroneously not read back to the jury was not testimony relating to the subject matter of the question posed, and was not, in fact, the "initial testimony" requested by the jury, we hold that its omission does not constitute reversible error.

## V

### INSTRUCTION REGARDING CREDIBILITY OF JOHN EDDY

Both defendants assert that the trial justice erred in failing to adequately instruct the jury regarding the assessment of John Eddy's credibility. We disagree. The trial justice instructed the jury with respect to witness Eddy's testimony as follows:

"Now, with regard to state's witness, Mr. Eddy. You have heard testimony here concerning considerations that were given to him in return for his agreement to testify for the state. You have heard all of that evidence and I will not rehash it or review it with you because your recollection is all, I am certain, fresh enough. You have the right, as you consider the testimony, all evidence [*sic*] to take into account the plea bargaining agreement or agreements entered into between Mr. Eddy and the state of Rhode Island. You may take into account the promise he received or the recommendations offered to him in return for his cooperation with the state in the prosecution of these two defendants. And you have a right to take into account whether or not those promises affected or influenced the credibility or the noncredibility of Mr. Eddy's in-Court testimony given here during the course of the trial. The mere fact that promises or considerations have been extended to a witness does not automatically mean that that witness's testimony is not to be believed by the jury. You are the judges of the facts. You have to decide whether or not Mr. Eddy came here and testified falsely in whole or in part because of the promises made to him or whether or not he came here and testified truthfully as to the facts that he testified to. That is your obligation and that is your responsibility as the judges of the facts."

Additionally, the trial justice instructed the jury generally as to credibility:

"You have to judge the credibility of each and every one of those witnesses who came here. You have to judge whether or not you are going to accept or reject their testimony in whole or in part. You are the judges of the credibility of the evidence that came from the witness stand. Now, in determining the weight and in determining the degree of credibility that you will give to a witness's testimony, you have the right to take into account as you assess and evaluate the testimony of all evidence here, the appearance of the witness, his or her manner of testifying, his or her apparent candor and fairness or lack of same. His or her bias or prejudice. His or her interest, if any, in the final outcome of this case and his or her apparent intelligence or lack of intelligence about the matters that are in controversy. You should always keep in mind that in considering the credibility and the weight that you will give to a witness's testimony you are not required to believe something to be a fact only because a witness or witnesses have stated that to be a fact. If in the light of all the evidence before you, you believe that a witness or witnesses are mistaken or that they have testified falsely to a fact, then you have

absolutely the right to disregard that witness's testimony in whole or in part."

The defendants claim as error the trial justice's refusal to instruct the jury in accordance with the following requested instructions:

"If the jury believes from the evidence that any person was induced to testify in this case by any promise from further punishment, or that any hope was held out or entertained by him that he would be rewarded or in any wise benefit if he implicated the defendant in the crimes charges herein, the jury *must* take such fact into consideration in determining what weight should be given to the testimony, closely scrutinize it and unless they can reconcile it with the truth, completely reject it.

"In weighing the testimony of a witness who testified under any promise of reward, the jury *must* consider that such promise of reward itself is a strong impelling reason for the witness to color and fabricate his testimony, and that such testimony must be weighed with a great deal of care and circumspection." (Emphasis added.)

In *State v. Fenner*, this court rejected an argument identical to the one we are presented with today. The instruction requested by defendants in this case is exactly the same as the one we considered in *Fenner* and proclaimed to be tantamount to "a peremptory instruction that [the witness's] testimony be disregarded in the event that it be found that he was induced to testify by promises of leniency." 503 A.2d at 525. In *Fenner*, this court noted that "it is probably better practice for a trial justice to avoid giving [specific] instructions * * * and to rely instead upon general instructions concerning credibility, motivation, bias, and the like." *Id.* Indeed we emphasized that "[c]ounsel rather than the court are the appropriate agents to argue to the jury concerning the specific credibility or lack thereof of a particular witness." *Id.; see State v. Caruolo*, 524 A.2d 575 (R.I.1987). It is our determination, therefore, that the trial justice correctly instructed the jury with respect to the assessment of John Eddy's credibility.

## VI

## RELEVANCY OF TESTIMONY REGARDING THREATS MADE TO JOHN EDDY BY STEPHEN KELLY

Both defendants claim as error the trial justice's admitting into evidence John Eddy's testimony that a man named Stephen Kelly impliedly threatened him if he testified against defendants. The defendants assert that evidence of such threats is irrelevant to the issue of consciousness of guilt because of the absence of evidence linking the threats made by Kelly to defendants. Although we agree that generally evidence of threats made to a witness is admissible only upon a showing that the defendant approved, encouraged, or acquiesced in the making of those threats, it is our determination that due to the circumstances under which the challenged testimony was presented, its admission was not erroneous.

The defense of defendants Burke and Crosby was based in part on a theory that defendants were being "railroaded" for a crime which had been committed by someone else. In the cross-examination of Eddy, both counsel attempted to lay a foundation for such a conversation between Eddy and Kelly. This inquiry elicited from Eddy a response that he had been approached and threatened by Kelly. Within the scope of redirect examination the prosecutor asked for more details about the conversation. In response to the objection of defense counsel the trial justice stated, "[I]t is my understanding that on cross-examination Kelly approached me [*sic*] and said something and this is what this is pertaining to. Overruled. Go ahead." Eddy thereupon answered the question posed, relating fully a conversation in which Kelly admonished Eddy not to testify against defendants.[3]

---

3. Eddy testified that Kelly told him "that he

[Kelly] had been offered money to make sure

It should be noted that Kelly was later presented as a defense witness and testified that Eddy told him that "he [Eddy] got word from the street that he knew who robbed the place. He said that them guys [Burke and Crosby] was getting railroaded."

■ We are of the opinion that neither the evidence concerning the threats, nor the evidence about the railroading were competent on the issue of guilt or innocence. The threat made by Kelly was not connected sufficiently to defendants to permit an inference that it was attributable to them or either of them. *See, e.g., Stewart v. State,* 398 So.2d 369 (Ala.Crim.App. 1981); *People v. Lybrand,* 115 Cal.App.3d 1, 171 Cal.Rptr. 157 (1981); *Campbell v. Commonwealth,* 564 S.W.2d 528 (Ky.1978); *cf. State v. Esposito,* 73 R.I. 94, 54 A.2d 1 (1947) (interference with witness admissible if defendant's involvement in such interference can reasonably be inferred from facts). By the same token, Mr. Eddy's opinion based upon information "from the street" was wholly incompetent as the result of the absence of first-hand information on the part of the witness. *E.g., Luther v. Borden,* 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849); *Clark's Executors v. Van Riemsdyk,* 13 U.S. (9 Cranch) 153, 3 L.Ed. 688 (1815); *McGinn v. B.H. Gladding Dry Goods Co.,* 40 R.I. 348, 101 A. 129 (1917). However, under the general doctrine of "fighting fire with fire," we cannot say that the trial justice abused his discretion in allowing redirect examination on a point that had been opened on cross-examination by counsel for defendant Burke.

Under the principle of curative admissibility known as "fighting fire with fire," the prior introduction of inadmissible evidence for a certain class of facts permits the trial justice to allow the introduction of answering inadmissible evidence pertaining to the same matter. *McCormick on Evidence,* § 57 at 146–49 (Cleary 3d Ed. 1984); 1 Wigmore, *Evidence,* § 15 at 733– 37 & n. 3 (Tillers rev. ed. 1983). When, as in this case, one party seeks the admission of inadmissible evidence without objection by his opponent, the allowance of answering evidence is within the sound discretion of the trial justice. *McCormick on Evidence* at 148; 1 Wigmore at 731.

Here, counsel for both the defendants sought to elicit from Eddy an admission that he had had with Kelly the conversation Kelly later testified to at trial. This conversation, during the course of which Eddy allegedly stated that the defendants were being "railroaded," was, as we have explained previously, clearly inadmissible. Eddy responded to questioning about his conversation with Kelly by stating that Kelly threatened him. On redirect, the prosecutor inquired further into this conversation whereupon the trial justice ruled the question permissible as pertaining to the conversation counsel referred to on crossexamination. We cannot, therefore, say that the trial justice abused his discretion in overruling the defendants' objection to the admission of the challenged testimony.

For the reasons stated, the defendants' appeal is denied and dismissed, the judgments of conviction are affirmed, and the papers in the case are remanded to the Superior Court.

MURRAY, Justice, dissenting.

My conclusions on several of the issues raised by the defendants are inapposite of the majority. In dissent these issues are delineated.

I

DENISE LAMOUREUX'S TESTIMONY

The majority opinion, which finds no error in the admission of Denise Lamoureux's testimony, appears to me to directly conflict with what this court said only two months ago in *State v. Mattatall,* 525 A.2d 49 (R.I. 1987). In the case at bar, the majority has decided that testimony by Ms. Lamoureux, based on surreptitious recordings she had made of defendants at police request, was admissible because defendant

[Eddy didn't testify against Burke and Crosby]  and then he showed me a gun."

Burke had made "an implicit threat" to Ms. Lamoureux, then a potential witness in the case. Because Burke was "tampering with a witness," the majority reasons, he was not entitled to the assistance of counsel. In *Mattatall*, however, this court, relying on *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), stated that the fact "that the police were present in the [codefendant's] home because of possible threats from [the] defendant" against the codefendant was "noncontrolling," hence the defendant was still entitled to the assistance of counsel as a protection against surreptitious police recordings. 525 A.2d at 52.

This court's opinion on this issue in *Mattatall* was dictated by the United States Supreme Court's opinion in *Moulton*. In *Moulton* the police surreptitiously recorded the defendant by wiring codefendant Gary Colson's telephone and person after the defendant had threatened to kill a witness named Gary Elwell. The Supreme Court held that, notwithstanding the fact that the surreptitious recordings had been found by the trial justice to have been made "in order to gather information concerning the anonymous threats that Mr. Colson had been receiving, to protect Mr. Colson and to gather information concerning defendant Moulton's plans to kill Gary Elwell," the statements were inadmissible at trial because the defendant's Sixth Amendment right to counsel had been violated. *Moulton,* 474 U.S. at 180, 106 S.Ct. at 482, 489, 88 L.Ed.2d at 490, 498. The Supreme Court said that "[t]o allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right * * *." *Id.* at 180, 106 S.Ct. at 489, 88 L.Ed.2d at 498. Thus, even though in *Moulton*, as in the case at bar, the defendant's lawyer would have been ethically precluded from assisting in the tampering with or killing of a witness, the defendant's Sixth Amendment right to counsel during police interrogations (which

is what surreptitious recordings in which the defendant is asked questions by a police informant amount to) remained intact.

Since it appears to me that the majority's opinion on this issue is inapposite of what this court said recently in *Mattatall*, and since, according to *Moulton*, which is binding upon this court, defendant Burke's Sixth Amendment rights to counsel were violated, I do not agree with the majority's conclusion. Because it cannot be said that the admission of incriminating statements made by Burke was harmless beyond a reasonable doubt, it is my view that he is entitled to a new trial.

## II
### REFERENCES TO DEFENDANT CROSBY'S INCARCERATION

It is my conclusion that the admission of testimony concerning defendant Crosby's incarceration at the ACI was erroneous. Knowledge of a criminal defendant's incarceration may have a serious, prejudicial effect on the jury. *State v. Pugliese*, 117 R.I. 21, 26, 362 A.2d 124, 126 (1976). In the instant case the record discloses no reason why the witness, John Eddy, could not have testified that on particular dates in January 1985 he was asked by defendants to help them by retrieving certain articles they had "stashed" near Foley's lounge. There appears to be no need to show that the reason defendants asked Eddy to help them was because they were incarcerated in the ACI at the time and expected Eddy to be released before them. Criminal defendants often involve other people in committing or covering up their criminal deeds, and for diverse reasons. Because the admission of Eddy's reference to defendants' incarceration was substantially more prejudicial than probative, it constituted error and deprived Crosby of his right to a fair trial. *See State v. DiPrete*, 468 A.2d 262, 266 (R.I. 1983). Hence defendant Crosby should be granted a new trial.

## III
### EDDY'S TESTIMONY REGARDING THREATS MADE BY STEPHEN KELLY

As the majority says, "generally evidence of threats made to a witness is admissible only upon a showing that the de-

fendant approved, encouraged or acquiesced in the making of those threats." Because there was no evidence presented in this case linking either defendant to threats made by Stephen Kelly, testimony of such threats was irrelevant. Further, such testimony is obviously hearsay.

My view does not comport with the majority's "fighting fire with fire" doctrine as applied in this case. The fact that defense counsel first asked Eddy on cross-examination if he had had a conversation with Stephen Kelly does not automatically make the substance of that irrelevant and prejudicial conversation, which is hearsay, admissible. The majority conclusion suggests that anytime a defense attorney in a criminal trial asks a witness whether he or she ever had a conversation with a third party, the substance of that conversation may then be elicited, over objection, by opposing counsel. In any event, Eddy's testimony in this case was, as the majority concedes, inadmissible, and because it implicitly linked defendants to the making of threats to a witness, it was highly prejudicial and its admission violated defendants' rights to a fair trial.

For the reasons delineated, I would sustain the defendants' appeals, vacate their convictions, and remand the case to the Superior Court for a new trial.