**STATE**

v.

**Edith MARTINEZ.**

**No. 92–203–C.A.**

Supreme Court of Rhode Island.

April 26, 1993.

Jeffrey Pine, Atty. Gen., Jane McSoley, Aaron Weisman, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Paula Rosin, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

FAY, Chief Justice.

This case comes to us on appeal by the defendant from a Superior Court conviction of second-degree murder and assault with a dangerous weapon. The defendant claims that the trial justice committed error (1) by informing the jury that the defendant was in custody during jury deliberations, (2) by failing to suppress certain evidence seized from the automobile of the defendant's wife, and (3) by failing to suppress the identifications made by three of the prosecution's key witnesses. For the reasons stated herein, we affirm.

In the early morning hours of March 4, 1990, a shooting outside a Providence bar named "Logan's Tap" resulted in the death of its owner, Thomas Logan (Logan). On March 21, 1990, defendant, Edith "Eddie" Martinez (Martinez), was indicted for the shooting and charged with murder, conspiracy to commit murder, and assault with a dangerous weapon. A jury trial commenced on April 29, 1991. The circumstances surrounding the shooting were the subject of great dispute at trial because witnesses from both sides presented conflicting testimony.

Various employees and patrons of Logan's Tap testified for the prosecution. Robin Ferry (Ferry), who was tending bar the night of the shooting, testified to the following. Sometime after 11:30 p.m. she noticed two Hispanic men enter the establishment and sit down at the bar. The men were later identified as Martinez and Ramon Paulino (Paulino). When Ferry asked them for their order, Martinez made an obscene remark to her. Thinking she had misunderstood him, Ferry asked Martinez to repeat his order. When he repeated the lewd statement, Ferry slapped Martinez across the face and summoned the bouncer, David Allen (Allen), to eject Martinez and Paulino.

Allen testified that Martinez and Paulino arrived at Logan's Tap at approximately 11:30 p.m. A short time thereafter Ferry told Allen what had happened, and Allen ordered the two men to leave the premises. Allen stated that Martinez was visibly upset, claiming that he had not done anything wrong and that Ferry was "crazy." Allen explained that once he removed the men from the bar, they repeatedly tried to reenter the establishment. When Allen went outside to tell the men to leave the premises, Martinez moved toward him. Allen admitted that he punched Martinez in the face, knocking him against the building. Eventually Martinez and Paulino got into a car and drove off. Witnesses described the car as a green, older-model Toyota or Datsun.

Approximately ten minutes later, Allen saw the same car return with its lights off.

Allen testified that when he saw the two men jump out of the car, he immediately locked the door and pulled down the window shade. After Ferry placed a call to 911, Logan insisted that Allen unlock the door. At this point Logan, Allen, and several bar patrons stepped outside and walked toward the men. As Martinez and Paulino backed toward the parking lot, Allen and Logan told Martinez that they did not like the remarks he had made inside the bar. According to Allen, Martinez then pulled out a gun, aimed it at Allen, and fired. Logan stepped in front of Allen and was shot in the chest.

Martinez testified on his own behalf and described a different sequence of events. He stated that Paulino had called him earlier in the evening and asked that Martinez meet him at a local restaurant. Martinez brought a gun with him because he knew that the restaurant was often patronized by individuals bearing weapons. After leaving the restaurant, Martinez and Paulino went to Logan's Tap, where Martinez had made plans to meet Rolando Flores (Flores). After entering the bar, Martinez engaged in conversation with Flores. Martinez, who speaks little English, went to the bar and ordered two rum and cokes and a "sambucca." The bartender asked him to repeat his order. When he did, she slapped him across the face. Martinez was then accosted by Allen and several other patrons, who pushed him out the door. According to Martinez, Allen wielded a gun and threatened him with the weapon. Once outside, Allen and the others continued to assault him. Martinez and Paulino were hastened to the car, and they drove away.

Martinez testified that the car stalled a short distance away from the bar. He and Paulino pushed the car to the side of the road and started to walk home. When they passed by Logan's Tap, the same crowd of people came out after them. Martinez stated that Allen brandished a baseball bat and yelled ethnic insults while the others spat at him. Martinez and Paulino were backing toward the car when Logan pulled out a gun. Martinez was scared so he pulled out his gun. The crowd scattered, leaving only Logan, Martinez, and Paulino confronting one another. Logan jumped on Martinez, and a struggle ensued. Paulino joined the scuffle, and Martinez's gun discharged. Martinez believed that his gun went off when Paulino, in an effort to grab for Martinez's gun, inadvertently pulled the trigger. Logan fell to the ground. In a panic Martinez and Paulino fled in the car.

The jury found Martinez guilty of second-degree murder and assault with a dangerous weapon. The trial justice denied Martinez's motion for a new trial. The trial justice subsequently sentenced Martinez to life imprisonment on the murder charge and a consecutive ten-year term on the assault charge. Martinez now appeals to this court. We shall set forth additional facts as is necessary to the discussion of each issue raised.

I

## MOTION TO DISMISS FOR INFORMING JURY THAT DEFENDANT WAS IN CUSTODY

■ Martinez was incarcerated throughout the trial because he was unable to post the bail set by the Superior Court. The jurors commenced deliberations on May 7, 1991. By the end of the day on May 8, they had not reached a verdict. When the trial justice excused the jury for the night, he made the following remarks: "By the time we transport the defendant to his resting place downstairs and the other logistics are taken care of, it will be 4:30. So I'm going to separate you again."

The next morning defense counsel moved for a dismissal on the ground that Martinez had suffered irreparable prejudice when the court informed the jurors that he was in custody. Although acknowledging that he had acted "inopportunely" in mentioning that Martinez was in custody, the trial justice denied the motion. In so holding, the trial justice opined that the statement was not prejudicial to defendant.

On appeal, defendant contends that the trial justice committed reversible error by

informing the jury that defendant was in custody. Accordingly defendant asserts that the trial justice was incorrect in refusing to pass the case.

■ It is well-settled law that the question of whether to grant a motion to pass a case is a matter within the sound discretion of the trial justice. *State v. Brown*, 522 A.2d 208, 210 (R.I.1987). Our inquiry on appeal is therefore limited to whether the trial justice abused that discretion. *State v. Carmody*, 471 A.2d 1363, 1366 (R.I. 1984).

This court has previously recognized that knowledge of a defendant's incarceration may have a serious prejudicial influence on the jury. *See State v. Burke*, 529 A.2d 621 (R.I.1987); *State v. Fenner*, 503 A.2d 518 (R.I.1986); *State v. Pugliese*, 117 R.I. 21, 362 A.2d 124 (1976). "The prejudicial effect that may arise from the jury's knowledge of a defendant's incarceration results from the likelihood that the jury will infer that the defendant is incarcerated as a result of previous criminal activity and is thus possessed of a general criminal disposition." *State v. Burke*, 529 A.2d at 628. This court has also recognized that there is no fixed formula for determining whether a particular statement is prejudicial. *State v. Pugliese*, 117 R.I. at 26, 362 A.2d at 126. "Rather, we [must] evaluate [the statement's] probable effect upon the outcome of the case." *Id.* at 26, 362 A.2d at 126–27.

After reviewing the transcript, we conclude that the trial justice did not abuse his discretion in finding that the reference to Martinez's incarceration was not prejudicial. As pointed out by the trial justice, marshals were never more than six feet away from Martinez throughout the trial. In fact, one of the marshals escorted Martinez to the witness stand and positioned himself no more than three feet away from Martinez during his testimony. We are in complete agreement with the trial justice's assessment that "the jury not being unintelligent people, would certainly come to the conclusion that [Martinez was] certainly being held within the constraints of the marshals, as distinguished from the sheriffs[,] who keep order in the courtroom

[and] who are dressed, incidentally, different." Furthermore the trial justice offered to give a cautionary instruction, but defense counsel refused, claiming that such an instruction would only draw further attention to the fact that Martinez was in custody.

The defendant cites several cases in support of his contention that the trial justice was clearly wrong in refusing to pass the case. *See Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Young v. Callahan*, 700 F.2d 32 (1st Cir. 1983); *People v. McCloud*, 69 A.D.2d 957, 416 N.Y.S.2d 337 (1979); *State v. Fenner*, 503 A.2d 518 (R.I.1986); *State v. Correra*, 430 A.2d 1251 (R.I.1981); *State v. Pugliese*, 117 R.I. 21, 362 A.2d 124 (1976). In each of these cases someone made reference to the defendant's incarceration, thus implying that the defendant had a criminal disposition. After reviewing these cases, we find that the evidence of the defendant's incarceration was much more obvious than the trial justice's statement in the case before us. As a result we believe the prejudicial impact in the aforementioned cases was far greater than in the case at hand.

We wish to address the *Pugliese* case, which we believe represents the closest factual setting to the case at hand. The *Pugliese* case involved the robbery of a convenience store wherein the identity of the robber was in issue. At trial the state called two eyewitnesses who provided very brief descriptions of the culprit. One of the witnesses testified that following the defendant's first trial, which ended in a mistrial, he was approached by an individual who claimed to be a friend of Pugliese's "from up at the A.C.I." The defense counsel immediately moved to pass the case. The trial justice denied the motion, stating that the defendant had not been prejudiced by the remark. After alluding to the presence of sheriffs and correctional officers in the courtroom throughout the trial, the trial justice reasoned that the average juror probably realizes that all defendants charged with serious crimes are incarcerated at the time of trial. In sustaining Pugliese's appeal, this court refused to adopt

the rationale of the trial justice. Instead we highlighted the considerable uncertainty surrounding the eyewitnesses' identification of the robber and concluded that "there was a reasonable possibility that the [witness's] reference to the 'A.C.I.' might have either influenced the decision on or detracted the jurors' attention from the identification issue and was, therefore, prejudicial." *Pugliese,* 117 R.I. at 27, 362 A.2d at 127.

We are of the opinion that the facts surrounding *Pugliese* are distinguishable from the matter now before us. Unlike *Pugliese,* there was never any question that Martinez was involved in the incident that resulted in Logan's death. In fact Martinez admitted that he was engaged in a struggle with Logan when the gun discharged. The only question the jury had to consider was whether Martinez shot Logan in an attempt to defend himself or whether Martinez shot him in cold blood. The fact that the jury may have become aware that Martinez was in custody during its deliberations did not have a significant bearing on his guilt or innocence. This was quite different from the *Pugliese* case wherein the jury's determination of whether Pugliese was the perpetrator of the crime might well have been influenced by hearing that Pugliese had been previously convicted of a crime or associated with convicted criminals.

Another factor that distinguishes the case at hand from *Pugliese* is the trial justice's willingness to give a cautionary instruction. We believe that a mere reference to "transporting [Martinez] to his resting place downstairs" was not prejudicial enough to warrant an outright declaration of a mistrial without an attempt to cure the prejudicial statement with a cautionary instruction. Unlike the trial justice in *Pugliese,* the trial justice in the case at hand offered to give such a curative instruction. The defendant, however, declined the jury instruction for strategic reasons.

For the reasons stated, we find that the trial justice did not abuse his discretion in denying defendant's motion to pass the case.

## II

## MOTION TO SUPPRESS EVIDENCE SEIZED FROM AUTOMOBILE

■ In the early morning of March 4, 1990, police interviewed several eyewitnesses to the shooting of Logan. On the basis of information obtained from these sources, the police quickly discovered that Martinez was the individual involved in the shooting. After Flores informed police that he knew where Martinez lived, Detective Stephen Springer accompanied Flores to Martinez's house in South Providence. Detective Springer testified that he and Flores drove to 88 Ontario Street, where Flores pointed out a multifamily dwelling. Flores also identified an automobile parked in back of the house as the one he had seen Martinez drive on previous occasions. The vehicle was a gray Ford Tempo bearing Rhode Island registration No. EZ 318. Several hours later the Providence police returned to the address with a warrant for Martinez's arrest, but Martinez was not at home.

Later that morning Sergeant Raymond Owens was on patrol when he heard a radio broadcast instructing officers to be on the lookout for the gray Ford Tempo. Soon thereafter Sergeant Owens spotted the car at a Providence gas station. Owens testified that he saw a man and a woman walking away from the car toward the gas station. Sergeant Owens called for assistance and apprehended the individuals as they exited from the gas station. The two were identified as Martinez and his wife, Idalia Martinez (Idalia). Martinez was placed under arrest, and both he and his wife were transported to the Providence police station.

The gray Ford Tempo, which was registered to Idalia, was towed to the police station. Detective William Carroll prepared an affidavit and obtained a warrant to search the vehicle. Additionally Idalia signed a consent form, permitting the police to search her automobile. Detective

Carroll searched the car and found a loaded handgun under the front passenger seat. Forensic experts concluded that the bullets recovered from Logan's body had been fired from the gun seized in Idalia's car.

Martinez filed a pretrial motion to suppress all the evidence seized from the search of his wife's automobile. The trial justice denied Martinez's motion, finding that Martinez did not have standing to challenge the search. Additionally, although recognizing that Idalia's consent was not essential for the execution of the search warrant, the trial justice implied that Idalia's voluntary consent to the search of her own automobile constituted independent justification for the search.

On appeal Martinez contends that the trial justice erred in finding that Martinez did not have standing to challenge the search. Martinez claims that he presented sufficient evidence to warrant a reasonable expectation of privacy in the vehicle. Martinez further argues that the police lacked probable cause to search the automobile because eyewitnesses had provided police with the description of an entirely different vehicle. Finally Martinez asserts that the search of the car cannot be upheld on the basis of Idalia's consent because (1) the trial justice never made a finding concerning the voluntariness of her consent and (2) Martinez presented competent evidence negating a finding of consent.

After reviewing the trial record, we find that the trial justice was correct in denying Martinez's motion. Even if we assume, without deciding, that defendant had standing to challenge the search and that the police lacked probable cause, we find that the search was permissible on the basis of Idalia's consent. Although the trial justice stated that it was not necessary to make a ruling on Idalia's consent to the search, he did make a finding that "there [was] no force and coercion with respect to her consent." Moreover, we need not rely on the ruling of the trial justice to justify our decision. It is well settled that this court may affirm a trial justice's ruling on grounds different from those upon which

he or she relied. *State v. Ellis*, 619 A.2d 418, 426 (R.I.1993).

This court is mindful that the state bears the burden of demonstrating by a preponderance of the evidence that consent is given freely and voluntarily. *State v. Beaumier*, 480 A.2d 1367, 1374 (R.I.1984). Our review of the trial record leads us to conclude that the state satisfied this burden. Detective Carroll testified that he, along with Detective Springer, fully explained to Idalia that they wished to search her automobile. They informed her that any evidence found as a result of this search would be used against Martinez. She freely signed the consent form without any force, coercion, or promises by the police. Furthermore Idalia admitted that no one forced her to make a statement or to sign the consent forms. Although she testified that she signed the forms because she was frightened the police would detain her further, she conceded that the police informed her that nothing would happen to her so long as she told the truth. Idalia acknowledged that the police had treated her well while she was at the station.

In light of the foregoing testimony we find that Idalia's consent to the search was given freely and voluntarily. Such consent provided independent justification for the search of her car. Accordingly we affirm the trial justice's denial of Martinez's motion to suppress.

### III

### MOTION TO SUPPRESS THE IDENTIFICATIONS MADE BY STATE'S WITNESSES

■ Following the shooting, Ferry described the assailant as "clean-shaven." Both Allen and Walter F. Reilly, Jr. (Reilly), a regular patron of Logan's Tap, concurred in this description. In an attempt to confirm that Martinez was the individual involved in the shooting, Detective Carroll showed a photographic display to Ferry, Allen, and Reilly. Immediately before showing each of these witnesses a series of photographs containing Martinez's picture, Carroll read the following instruction from

a routine-procedure manual utilized by the Providence police department:

"In a moment I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. *Keep in mind that hair styles, beards and moustaches may be easily changed.* * * * When you have looked at all the photos, tell me whether you see the person who committed the crime. Do not tell other witnesses that you have or have not identified anyone." (Emphasis added.)

Ferry, Allen, and Reilly all chose the photo of Martinez, which depicted Martinez with a mustache. All three of these individuals testified that Carroll did not make any suggestive comments encouraging them to select Martinez's photograph. Each of the three witnesses identified Martinez as the assailant within a few seconds of viewing the photographs.

Prior to trial Martinez moved to suppress the photographic identifications made by Ferry, Allen, and Reilly. The trial justice denied the motion. On appeal Martinez asserts that the admonishment read by Detective Carroll prior to showing the photographic array to the witnesses was unnecessarily suggestive. In support of his argument, Martinez points to the discrepancy between the witnesses' initial description of the assailant and Martinez's actual appearance in the photograph. Martinez avers that if Carroll had not instructed the witnesses essentially to ignore the discrepancy in facial hair, this difference may have inhibited them from identifying Martinez as the assailant.

The law in this jurisdiction relating to the admissibility of an out-of-court identification is well settled:

"Under the two-prong test promulgated by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), this court must first determine whether the photographic array was unnecessarily suggestive. * * * If we answer this query affirmatively, our attention is then directed to an examination of the totality of the circumstances to assess the independent reliability of the identification." *State v. Barnes*, 559 A.2d 136, 140 (R.I.1989); *see State v. Mastracchio*, 612 A.2d 698, 704 (R.I.1992).

Applying this standard to the case at hand, we are of the opinion that the photographic-identification procedure utilized by the Providence police department was not impermissibly suggestive. We agree with the trial justice's assessment that the photographic display itself was "completely absent of any suggestivity." Additionally we disagree with Martinez's claim that the preliminary statement read by Detective Carroll was overly prejudicial. The statement contained routine directions from a standard-procedure manual. We find that the contents of this language did not focus attention on any one defendant in the photographic array. If anything, the instructions served to protect Martinez from a faulty identification. Furthermore, all the witnesses testified that no one from the police department made any suggestive comments encouraging them to choose Martinez. Each witness's decision was made of his or her own volition and within seconds of viewing the photographic display. We are convinced that the identification procedure utilized in this case was not susceptible of suggestive misidentification.

Because we conclude that the identification procedures utilized in this case were not unnecessarily suggestive, we need not reach the second prong of the *Manson* test regarding the reliability of each witness's identification of Martinez.

For the reasons stated above, we affirm the judgment of the Superior Court. The defendant's appeal is hereby denied and dismissed, and the papers in the case are remanded to the Superior Court.