December 3, 2019

**Supreme Court**

No. 2018-129-C.A.
(P1/14-2479A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Leopoldo Belen. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |  |
|---|---|---|
| State | : |  |
| v. | : |  |
| Leopoldo Belen. | : |  |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** The defendant, Leopoldo Belen, appeals from a judgment of conviction after a jury found him guilty of four counts of first-degree sexual assault. The defendant argues that the trial justice erred when he did not declare a mistrial after the prosecutor made two improper comments during closing arguments. After thoroughly reviewing the record and after considering the arguments of the parties, we affirm the judgment of conviction.

## I

### Facts and Travel

Belen and Emily[1] met in Providence approximately one year before the alleged assault. On the day the couple met, Emily was walking to her job at a fast-food restaurant when Belen approached her in his car. From this chance encounter, Belen and Emily became friends, a friendship that quickly developed into a romantic relationship. After they dated for a few months, Belen and Emily moved together to an apartment in Woonsocket.

---

[1] To protect the anonymity of the complaining witness, we have used a pseudonym in place of the victim's name in this opinion.

1

Belen was not working at that time, and soon thereafter Emily lost her job. Emily testified at trial that, at Belen's insistence, she became an "escort." Emily testified that Belen "was pretty persistent so eventually [she] just gave in." While Emily was working as an escort, Belen would drive her to and from her appointments with her customers.

In the early morning of April 1, 2014, Emily claimed that she was sexually assaulted by Belen in their shared apartment. Just days before the assault, Belen and Emily had cavorted with an unnamed woman at a motel in Warwick, and, she testified, the three had engaged in a variety of consensual sex acts during their overnight stay. After their weekend frolic, Emily and Belen returned to their apartment. Emily described Belen's demeanor at that time as "[e]xtremely hostile." Emily testified that, as a result, she "tried to keep [her] distance" that night. However, some time during the night Emily noticed that the battery to her cell phone had been removed.

The next morning, Belen woke Emily and asked whether she had smoked their last cigarette. She told him that she had in fact smoked it. At that response, Emily said that, an apparently enraged Belen began to physically assault her. According to Emily, Belen then began to assault her sexually and physically over the course of the next two hours, at times raping her with a hair mousse bottle. She said that she was naked and bleeding from her nose because of the physical and sexual abuse. According to Emily, Belen, while cleaning up blood, became more agitated at the fact that she was bleeding in the bathroom where he was assaulting her. She testified that Belen closed all the windows and played music to cover up the clamor caused by the assault.

At some point, Belen strangled Emily and she passed out. Emily testified that after she regained consciousness she told Belen that she was feeling lightheaded and that she needed to eat something. Belen then permitted her to go to the kitchen to heat up some food. When Belen turned his back on her to go back to the bathroom, Emily covered her naked body with a sheet and fled

2

the apartment.  She said that she ran downstairs and banged on a neighbor's door.  The neighbor allowed her to come into the apartment and provided a phone so that Emily could call the police.

When the police arrived, Belen was no longer in the apartment.  Emily was transported to the hospital by ambulance.  At the hospital, a nurse performed an examination using a "sexual assault kit."  At trial, an expert witness called by the state testified that Belen's DNA had been found on the can of hair mousse that Emily claimed had been used in the sexual assault.  Belen's DNA was also present on swabs obtained from Emily's body.  Under cross examination, the expert conceded that the DNA on the swabs could have been the result of consensual sex that may have occurred from thirty-six to forty-eight hours before the test was administered to Emily.

Emily's neighbor testified at trial and said that she had not heard any screaming, banging, or loud music emanating from the apartment shared by Emily and Belen.  However, she also testified that a frantic and hysterical Emily appeared at her door that morning clothed only in a sheet.

On August 18, 2014, a grand jury indicted Belen on four counts of first-degree sexual assault in violation of G.L. 1956 § 11-37-2.  Prior to the indictment, Belen, who was being held without bail, made several phone calls to Emily.  Those calls were recorded by the Adult Correctional Institutions, and one of them was played for the jury at trial.  Significantly, the trial justice had granted defendant's motion *in limine* and ordered that the fact that the call was originally from the ACI be redacted.  In the recorded phone call played for the jury, Belen apologized to Emily, telling her that he made a mistake, he was not in his right state of mind, and he was only human.[2]  Emily in response called Belen a monster, to which Belen replied: "Listen, even monsters make mistakes."

---

[2] We rely on the state's transcript of the call, because Belen did not challenge its accuracy at trial.

3

At the close of evidence, and during her final argument, the prosecutor made two statements that lie at the heart of this appeal. First, the prosecutor inadvertently referred to the "ACI" when she discussed the recorded phone conversation that had been played for the jury.[3] In her statement, the prosecutor said: "One thing you will have upstairs with you in the jury deliberation room is the ACI—excuse me, is the phone call [Emily] told you about."

Second, also during her closing argument, the prosecutor said the following about the victim's testimony:

> "In addition to telling these stories, as long as [defense counsel] is going to make gender based arguments, I don't know about all the women on the jury, but I hate getting pap smears and a yearly exam and that is one more thing she had to do that morning. When you heard from the nurse, in order to have a sexual assault kit done, and she was told and she gave consent that she would have a speculum inserted into her vagina to take the vaginal swabs and then also taking of the anal swabs. Again, one more thing to ask yourself, why would she lie? Why would she make all this up? Doesn't make sense?"

Belen's attorney objected to the reference to the ACI after the prosecutor's closing argument had concluded. In addition, the trial justice, *sua sponte*, raised the issue of the prosecutor having related her personal experience as part of her final argument. The trial justice ruled that both of those comments were improper, and he suggested that he provide the jury with a cautionary instruction. Belen declined the trial justice's offer of a cautionary instruction, but he did make a move to pass the case based on the reference to the "ACI."[4] The trial justice denied that motion because, he said, the jury was not "so tainted that they could not continue to deliberate and render a fair and impartial verdict[.]"

---

[3] It is not disputed that the prosecutor's reference to the ACI was inadvertent.
[4] In Rhode Island, the terms "motion to pass" and "motion for a mistrial" are used interchangeably.

The jury returned a verdict of guilty on all four counts of first-degree sexual assault. The trial justice sentenced the defendant to four concurrent life sentences. Belen timely appealed.

## II

## Standard of Review

"It is well settled that a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Roscoe*, 198 A.3d 1232, 1237 (R.I. 2019) (quoting *State v. Dubois*, 36 A.3d 191, 197 (R.I. 2012)). "We have often stated that the trial justice has a front row seat during the trial so that he can best evaluate the effects of any prejudice on the jury." *Id.* (quoting *Dubois*, 36 A.3d at 197). "The ruling of the trial justice is accorded great weight and will not be disturbed on appeal unless clearly wrong." *Id.* (deletion omitted) (quoting *Dubois*, 36 A.3d at 197).

## III

## Discussion

Before this Court, Belen argues that the trial justice erred by (1) failing to grant his motion to pass the case after the prosecutor made an inappropriate remark during her closing argument when she referred to the "ACI," and (2) failing to pass the case after the prosecutor improperly vouched for the credibility of the victim during her closing argument.

## A

## ACI Reference

Belen first takes issue with the prosecutor's inadvertent and brief reference to the ACI during her closing argument. However, before we address this issue, we must first determine whether the issue is properly before us. "To preserve an objection to a prosecutor's closing argument, defense counsel must not only make an objection at the time, but must make a request

for a cautionary instruction or move for a mistrial." *State v. Whitfield*, 93 A.3d 1011, 1018 (R.I. 2014) (deletion omitted) (quoting *State v. Horton*, 871 A.2d 959, 964 (R.I. 2005)).

The record is pellucid that Belen did voice an objection and that he moved for a mistrial. What is also clear, however, is that Belen did not contemporaneously object at the time the prosecutor made her statement.

The relevant sequence of events is as follows: The trial justice chose to instruct the jury before closing arguments, not after, in this case. After the prosecutor's closing argument, the trial justice determined that he should give one additional instruction.[5] When he did so, the trial justice inquired if either party needed a sidebar regarding the jury charge. At that time, Belen's attorney raised his objection to the prosecutor's reference to the ACI, and he moved for a mistrial.

Although the objection was not made immediately following the prosecutor's comment, it is our opinion that, under the circumstances before us, the objection was nonetheless timely. In *State v. Boillard*, 789 A.2d 881 (R.I. 2002), we held that, in certain limited circumstances, objecting after the prosecutor had completed his closing argument might preserve the objection. *Boillard*, 789 A.2d at 884. Here, the prosecutor, in a slip of the tongue, used the term "ACI" in the middle of a sentence. She immediately realized her mistake, and she moved on without further incident. It was therefore unnecessary for defense counsel to lodge a contemporaneous objection in an effort to stop the prosecutor from continuing to discuss Belen's incarceration, a subject that had been prohibited by the trial justice. Given the context of the remark, Belen's objection was timely even if not made immediately following the prosecutor's remark.

---

[5] The trial justice's instruction explained, in part, the rule that, in rendering a verdict, the jurors must be unanimous and must agree on the verdict.

6

Thus, we turn to the merits of the issue. "There is no formula in law which precisely delineates the proper bounds of a prosecutor's argument." *Roscoe*, 198 A.3d at 1237 (brackets and deletion omitted) (quoting *State v. Tucker*, 111 A.3d 376, 388 (R.I. 2015)). "Prosecutors enjoy 'considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record.'" *Id.* (quoting *State v. Barkmeyer*, 949 A.2d 984, 1007 (R.I. 2008)). However, we have held that if a prosecutor's remarks are "totally extraneous to the issues in the case and tend to inflame and arouse the passions of the jury[,]" then such comments are improper. *Boillard*, 789 A.2d at 885 (quoting *State v. Mancini*, 108 R.I. 261, 273, 274 A.2d 742, 748 (1971)). To merit a mistrial, the statement must not only be improper, but also so prejudicial that a cautionary instruction would be insufficient to cure the prejudice. *State v. Martinez*, 624 A.2d 291, 294 (R.I. 1993). "This [C]ourt has * * * recognized that there is no fixed formula for determining whether a particular statement is prejudicial." *Id.* "Rather, we must evaluate the statement's probable effect upon the outcome of the case." *Id.* (brackets omitted) (quoting *State v. Pugliese*, 117 R.I. 21, 26, 362 A.2d 124, 126-27 (1976)).

There is no doubt in our minds that the prosecutor's comment was improper. The issue remains, however, whether the comment was so prejudicial in the context of this case that the failure to grant a mistrial rises to an abuse of discretion. "This [C]ourt has previously recognized that knowledge of a defendant's incarceration may have a serious prejudicial influence on the jury." *Martinez*, 624 A.2d at 294. "The prejudicial effect that may arise from the jury's knowledge of a defendant's incarceration results from the likelihood that the jury will infer that the defendant is incarcerated as a result of previous criminal activity and is thus possessed of a general criminal disposition." *Id.* (quoting *State v. Burke*, 529 A.2d 621, 628 (R.I. 1987)).

7

Belen argues that this case is similar to *Pugliese* and, thus, a mistrial was required. *See Pugliese*, 117 R.I. at 27, 362 A.2d at 127 (holding that reference to the ACI in that case was prejudicial because there was a reasonable possibility that it might have influenced the jury's decision). In our opinion, however, Belen's reliance on *Pugliese* is misplaced. In *Pugliese*, the state's only identification witness referred to the defendant's incarceration during the course of his testimony. *Id.* at 125. The witness made the reference while the state was attempting to rehabilitate the witness's credibility after the witness had recanted his identification of the defendant as the perpetrator. *Id.* When the state asked the witness whether anyone had approached the witness about his testimony, the witness responded that a man had approached him and that the man said "he was Pugliese's friend from up at the A.C.I." *Id.*

The defendant objected and moved for a mistrial. *Pugliese*, 117 R.I. at 27, 362 A.2d at 125. The trial justice denied the motion and did not offer to provide a cautionary instruction. *Id.* at 126. During jury deliberations, the jury, after nearly five hours of deliberation, sent a note to the trial justice saying they could not reach a verdict. *Id.* at 127. The trial justice urged the jury to continue to deliberate and break the impasse. *Id.* The jury returned a guilty verdict almost an hour later. *Id.* The jury attached a note to the verdict that said: "We have reached a verdict. God help us." *Id.* On appeal, this Court vacated the defendant's conviction. *Id.* We are led to the conclusion that this Court vacated the conviction for three reasons, all of which were based on the reference to the defendant's incarceration. *Id.* First, this Court was unable to conclude that there had not been an impact on the jury. *Id.* Second, the reference to the defendant's incarceration was made by a witness, during the state's attempt to rehabilitate the witness's credibility. *Id.* at 125. Finally, the evidence of guilt was far from overwhelming. *Id.* at 126.

8

The present case is distinguishable from *Pugliese*. There is nothing in the record that would indicate or even allow us to infer that the comment had any impact on the jury's deliberations. In fact, from his front-row seat, the trial justice observed that the abortive remark had "just slid past" the jurors. Furthermore, the prosecutor made the unintentional remark during her closing argument; it was not uttered by a witness nor did it have any impact on the credibility of a witness. Finally, even though there is no overwhelming evidence of guilt in this case, there is substantially more evidence of guilt than was present in *Pugliese*. In *Pugliese*, the state's witness who identified the defendant had only briefly seen the defendant's face. *Pugliese*, 117 R.I. at 24, 362 A.2d at 125. The state's other witness was unable to identify the defendant as the perpetrator. *Id.* In the case at hand, even though the case essentially came down to the credibility of Emily, there was additional corroborating evidence to support Emily's allegations including physical evidence and Belen's own recorded statements.

After thoroughly reviewing the record, we conclude that the trial justice acted within his discretion in refusing to pass the case. The trial justice found that the comment likely had little impact on the jury because the comment, in the trial justice's words, "just slid past" them. The context of the reference supports this conclusion. The term "ACI" was dropped by the prosecutor into a completely unrelated sentence. The term was a *non sequitur* because it added nothing to the meaning of the sentence. We cannot fathom that it was of such consequence to have had a prejudicial impact on the jury.

**B**

**Improper Vouching**

Belen next takes issue with the prosecutor relating her personal experience during her closing argument.[6]   However, the state argues that Belen waived this argument by failing to properly object or move for a mistrial.

As we have said, "[t]o preserve an objection to a prosecutor's closing argument, defense counsel must not only make an objection at the time, but must make a request for cautionary instructions or move for a mistrial." *Whitfield*, 93 A.3d at 1018 (deletion omitted).

Here, defense counsel objected neither at the time the prosecutor made her comments nor at the sidebar, nor did defense counsel move for a mistrial or request a cautionary instruction.   In fact, it was the trial justice who, *sua sponte*, raised the issue after closing arguments.   At that time, the trial justice ruled that the comment was improper, but he also explained that a mistrial was unwarranted.   In response, defense counsel candidly said:

> "I will say, your Honor, I did hear [the prosecutor's] statement about that speculum or whatever the heck it is called and while I personally have no experience with it, I had because it was passing and maybe—well, I didn't object."

---

[6] The trial justice referred to the prosecutor's personalization as violating what is sometimes known as the "golden rule."  On the other hand, Belen argues that the personalization was in fact improper vouching.  This Court has never embraced or even defined the doctrine of the "golden rule"; however, the Supreme Court of Connecticut has stated that a golden rule argument "urges jurors to put themselves in a particular party's place or into a particular party's shoes[.]" *State v. Stephen J.R.*, 72 A.3d 379, 393 (Conn. 2013) (deletion omitted).  We have defined improper vouching as a prosecutor's argument that introduces the prosecutor's own experience or evidence not in the record to bolster the credibility of a witness. *Jaiman v. State*, 55 A.3d 224, 237 (R.I. 2012).  Nonetheless the difference between these two doctrines is not relevant to this appeal.  The trial justice in the present case found that the comment was improper. Thus, the ultimate focus is on whether it was prejudicial.  We therefore decline to distinguish whether the prosecutor's remark constituted either vouching or a violation of the "golden rule."

Thus, because counsel did not press an objection, move for a mistrial, or request a curative instruction on that issue, it has been waived.

In any event, we find no fault with the trial justice's ruling. We agree that the personalization by the prosecutor was ill advised but conclude that it was not prejudicial to the extent that it rendered the proceedings unfair. Furthermore, any potential prejudice was offset by the trial justice's general instructions that the parties' closing arguments are not evidence.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Leopoldo Belen. |
| **Case Number** | No. 2018-129-C.A. (P1/14-2479A) |
| **Date Opinion Filed** | December 3, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State:<br><br>Lauren S. Zurier<br>Department of Attorney General |
| | For Defendant:<br><br>Angela M. Yingling<br>Office of the Public Defender |