William BURKE, Petitioner,

v.

George VOSE, Director, Rhode Island Dept. Corrections, and James O'Neil, Rhode Island Attorney General, Respondents.

C.A. No. 92–0261–T.

United States District Court, D. Rhode Island.

May 24, 1993.

See also, 529 A.2d 621.

**22.** Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b).

**23.** *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).

Daniel V. McKinnon, Pawtucket, RI, for petitioner.

Annie Goldberg, Office of the Atty. Gen., Appellate Div., Providence, RI, for respondents.

### ORDER

TORRES, District Judge.

The Report and Recommendation of United States Magistrate Judge Timothy M. Boudewyns filed on April 12, 1993, is accepted pursuant to Title 28, United States Code, Section 636(b)(1)(B).

The petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254 is denied, and the case is dismissed.

## REPORT AND RECOMMENDATION

BOUDEWYNS, United States Magistrate Judge.

Petitioner William Burke ("Burke" or "the petitioner") seeks federal habeas corpus relief, pursuant to 28 U.S.C. § 2254, from his state convictions in 1985 for multiple counts of robbery and other offenses committed in 1982. The convictions were affirmed on direct appeal to the Supreme Court of Rhode Island in 1987 [1] and the denial of a subsequent motion for new trial was also affirmed.[2] The bases for this petition are twofold. First, Burke claims that he was denied his Sixth Amendment right to counsel when a witness at his trial was allowed to testify about Burke's post-indictment attempts, by threats and bribery, to prevent that witness from testifying. Second, Burke claims that his due process rights were violated when the state negligently misplaced evidence after his first trial (which ended in a mistrial) and before the second trial. Based on the following analysis, I recommend that the petition be denied.

### Procedural History

The facts relevant to the petition are as follows.[3] "On December 20, 1982, two armed men wearing masks and gloves entered Foley's Lounge in Cumberland, Rhode Island, robbed several patrons and employees of the bar, and fled. Shortly thereafter, defendants [William] Burke and [Kelly] Crosby were arrested and charged in connection with the robbery. Two employees of the lounge recognized the voice of one of the robbers as that of defendant Burke, a regular patron of Foley's Lounge." [4] "One of the employees was Denise Lamoureux. She had been present during the robbery which took place on December 20, 1982. At that time she recognized the voice of one of the robbers as that of William Burke. She also recognized his profile under a stocking mask that he wore." [5]

The case proceeded to trial in September of 1984, but that trial ended in the declaration of a mistrial.[6] A month later, while on bail awaiting a second trial, Burke sought out Ms. Lamoureux at her place of employment and had two conversations six days apart with her. The latter conversation became the object of a motion to suppress by both defendants and is one of the grounds of the instant petition. The Rhode Island Supreme Court determined the factual circumstances of the two encounters to have been as follows:

On October 29, 1984, Ms. Lamoureux was working as a waitress at the St. James Hotel in Woonsocket. She was approached by Burke who asked her whether she knew that he was one of the robbers at Foley's Lounge. He then ended the conversation by saying, "Well, you do what you have to do and I will do what I have to do." Burke then proceeded to watch her from the far end of the lounge for the rest of the evening.

After reflecting on this conversation for a couple of days, Ms. Lamoureux went to the Woonsocket Police and told them that she was in fear of going to work and didn't know what to do.

Officer Gordon Tempest suggested that she go to work, but that she wear a sound transmitter while working. The transmitter would be monitored by policemen in plainclothes. The next Friday, Ms. Lamoureux went to work and was approached by both defendants Crosby and Burke. She stated to Crosby, "My gripe is not with you. It is with Billy and if I talk to

---

1. *State v. Burke,* 529 A.2d 621 (R.I.1987).

2. *State v. Burke,* 559 A.2d 1062 (R.I.1989).

3. The facts found by the Supreme Court of Rhode Island in its two pertinent opinions in this case are essentially undisputed by the petitioner and "shall be presumed to be correct." 28 U.S.C. § 2254(d); *see also, Sumner v. Mata,* 449 U.S. 539, 540, 101 S.Ct. 764, 765, 66 L.Ed.2d 722 (1981); *after remand,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982).

4. *State v. Burke,* 529 A.2d 621, 622 (R.I.1987).

5. *Id.* at 623.

6. *Id.* at 622.

somebody, it is going to be him." Burke was behind her and came over at Crosby's signal. Ms. Lamoureux asked Burke what he meant by the statement, "You do what you have to do and I will do what I have to do." Burke responded that she had no reason to be afraid of him. He then asked her how much money she had lost in the robbery. . . .

The following is a verbatim reprint of the relevant portion of the trial testimony at the center of this case as offered by petitioner. It is an expanded version of the trial testimony reprinted in *State v. Burke:*

"Q. And who spoke first, you or Billy Burke?

"A. I think I did. I said, "What did you mean by that statement, you do what you have to do and I will do what I have to do?" I wanted to know if he was threatening my life or was that a threat and that is how the conversation started.

"Q. You asked the question?

"A. Yes, I did.

"Q. Did he say anything when you asked him that question?

"A. I think he said, "You don't have anything to fear from me."

"Q. And what did you say, Miss Lamoureux, next?

"A. Well, I probably said I didn't believe him, but the conversation kept going and he said, "How much money did you lose in that robbery?"

"Q. And what did you say, if you remember?

"A. I said, 'One hundred dollars.' It wasn't the same. I said one hundred dollars.

"Q. After you said that, did he say something?

"A. He said, 'I will give you two hundred dollars if you forget you heard my voice.'

"Q. Did he say, 'My voice'?

"A. 'If you forget you heard my voice.'

"Q. Did he say, 'My' or did he use his name?

"A. He used his name.

"Q. What do you remember exactly what he said, Miss Lamoureux in reference to the money?

"A. All he said was, 'I will give you two hundred dollars to forget you heard Billy Burke's voice that night.' And then I didn't say nothing and he proceeded to offer me three hundred, four hundred and five hundred dollars."

"Q. And did you respond when he offered you that money?

"A. At one point I said, "I don't take bribes."

MR. McKINNON: Objection, move to strike.

THE COURT: Grounds?

MR. McKINNON: Conclusion by the witness as to what was going on.

THE COURT: Overruled.

"Q. Miss Lamoureux, after Billy Burke offered you money to forget that you remembered his voice, do you remember what he next started to talk about?

"A. He started to tell me that it wasn't him that robbed Foley's because he robbed Hunter's Pharmacy because they had been robbed almost at the same time about an hour earlier. He also—

MR. McKINNON: Objection, move to strike.

THE COURT: Yes, that part is the time of another robbery or something of that nature will be disregarded by the Jury. The remainder of it, however, may stand as to what he is alleged to have said. Just tell us what he said, don't tell us—

"Q. That is what he said.

THE COURT: Well, what did he say to you?

"A. He said something that he was not there. He didn't do it, but the people who did were looking for thousands of dollars of cocaine which "Red" Delaurier had.

"Q. Did he use the name, "Red" Delaurier?

"A. Yes, he did.

"Q. And did you know at that time, Miss Lamoureux, who "Red" Delaurier was?

"A. No.

"Q. Did you continue to converse with Billy Burke after he mentioned "Red" Delaurier, Miss Lamoureux?

"A. Yes.

"Q. And what did he say next to you, if you can remember?

"A. I asked him a few things. I don't remember what else I asked him. I asked him if he knew a girl named Diane and he said Badeau and I said yes that is the girl that was in the bar and he says, "I wanted to know if that was his girlfriend" and he said, "No, I was going out with her sister, her older sister."

"Q. Did you first use the name Badeau or did Billy Burke use the name Badeau?

"A. He did. I just said Diane.

"Q. Did you know her last name at that time?

"A. Yes.

"Q. But you just asked him if he knew Diane, is that correct?

"A. Uh-huh.

"Q. Does he mention "Red" Delaurier at all during the remainder of your conversation, Miss Lamoureux? Did he mention the name more than once?

"A. I don't recall.

"Q. And did Billy Burke say that he knew Diane Badeau?

"A. Yes he did.

MR. McKINNON: Objection.

THE COURT: Grounds?

MR. McKINNON: Leading.

THE COURT: Well, she has already testified to it. It may stand. The answer may stand.

7. TR2 Vol. II at 314–20. It is important to note that the recording of Ms. Lamoureux's conversation was not used at trial, although she did use the transcript of the recording in order to refresh her recollection. The testimony that she gave in court was her own testimony unassisted and unsupplemented by the recording that had been made.

8. *Burke*, 529 A.2d 621, 627 (R.I.1987).

9. *Id.*

"Q. Miss Lamoureux, about how long did your conversations with Billy Burke last that night?

"A. I don't know, ten minutes. I have no idea. I really couldn't say for sure how long. . . . [7]

At the trial, the State also presented the testimony of John Eddy, who, along with defendants Burke and Crosby, was incarcerated at the Adult Correctional Institutions in January of 1985.[8] "Eddy testified that while at the ACI, defendants approached him, admitted their involvement in the Foley's Lounge robbery, and, believing that Eddy would be released soon, attempted to enlist his aid in disposing of evidence left near the scene of the crime." [9]

"This evidence, found near the crime scene, consisted of a discarded nylon stocking, a pair of blue jeans, an orange toque, a red bandanna, and a gray hooded sweatshirt." [10] These "articles of clothing allegedly worn by Crosby during the robbery were available for admission in evidence against both the defendants" at the time of their first trial in September of 1984, which ended in mistrial.[11] "At the time of the second trial in June of 1985, however, this tangible evidence apparently could not be located. Consequently, previously taken black-and-white photographs of the lost items were admitted in evidence at trial without objection." [12]

Defendants Burke and Crosby were each found guilty of seven counts of robbery and one count of assault with intent to rob.[13] Burke was also convicted of carrying an unlicensed pistol.[14] Motions for a new trial were denied on October 4, 1985, and the defendants appealed.[15]

10. *State v. Burke*, 559 A.2d 1062, 1063 (R.I. 1989).

11. *Id.*

12. *Id.*

13. *State v. Burke*, 529 A.2d at 622; *State v. Burke*, 559 A.2d at 1063.

14. *Id.*

15. *State v. Burke*, 559 A.2d at 1063.

"Approximately one month later, during the pendency of the defendants' appeal, the state notified both defendants that the physical evidence had been located by the Cumberland police on October 31, 1985 while they were transferring evidence to a new evidence locker, buried under some other evidence." [16] After an inspection of the various items, Burke and Crosby both moved for a new trial, each on the ground of newly discovered evidence. The Supreme Court remanded that matter to the Superior Court for the limited purpose of allowing defendants to present their motions to a justice of that court, while specifically retaining the direct appeal on its May 1987 argument calendar. Its decision issued in July 1987 affirmed both convictions. The motions for a new trial based on newly discovered evidence were heard and denied by the justice who presided over the second trial, and the appeal from that ruling was denied and dismissed. [17] The denial of a new trial on that ground is the second basis on which petitioner seeks a writ of habeas corpus.

*Discussion*

■ A motion under 28 U.S.C. § 2254 is a substitute for habeas corpus. The basic scope of habeas corpus is prescribed by 28 U.S.C. § 2241(c), which provides that the "writ of habeas corpus shall not extend to a prisoner unless ... (h)e is in custody in violation of the Constitution." Section 2254 deals specifically with state custody, providing that habeas corpus shall apply only in behalf of a person in custody pursuant to a judgment of a state court.

■ Because review under Section 2254 is limited to searching for Constitutional er-ror, [18] a federal court must apply federal constitutional law in habeas corpus proceedings, and it may apply that law to reliably found state facts. [19] There is generally a presumption of correctness for state court findings of fact pursuant to § 2254(d) unless any of eight listed exceptions applies. [20] None of those exceptions apply in this case. Federal courts have broad discretionary powers when acting on habeas petitions. Indeed, 28 U.S.C. § 2243 provides that "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." [21]

1. *Ms. Lamoureux's Trial Testimony*

a. *The Sixth Amendment Exclusionary Rule*

As the first ground for relief in his petition, petitioner claims he was denied his Sixth Amendment right to the post-indictment representation of counsel when Denise Lamoureux was permitted to testify that petitioner approached her at the St. James Hotel on November 4, 1985, and offered her money not to testify that she had recognized him as one of the robbers. Specifically, the witness told the jury that petitioner asked her "to forget [she] heard Billy Burke's voice that night." [22] Since the witness was then wearing a sound transmitter monitored and supplied to her by the Woonsocket Police, petitioner contends this was an instance of police "interrogation" in the absence of his counsel, in violation of the rule enunciated in *Massiah v. United States*, [23] and its progeny.

After a review of the four justice majority decision and Justice Murray's dissent in *State v. Burke*, 529 A.2d 621 (R.I.1987), I find

16. *Id.*

17. *Id.* at 1064.

18. *Grieco v. Meachum*, 533 F.2d 713, 716 (1st Cir.) (citing 28 U.S.C. § 2254(a)), *cert. denied sub nom. Cassesso v. Meachum*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976).

19. *Santos v. Laurie*, 433 F.Supp. 195, 197 (D.R.I. 1977).

20. *Chaney v. Brown*, 730 F.2d 1334, 1344 & n. 16 (10th Cir.), *cert. denied*, 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984).

21. *See Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Fay v. Noia*, 372 U.S. 391, 422, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), *overruled on other grounds, Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

22. *State v. Burke*, 529 A.2d at 624.

23. 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

the majority decision affirming Burke's conviction to be in accord with the principles of the Sixth Amendment, as well as the Supreme Court's application of the Sixth Amendment to similar facts in the cases of *Massiah*, *United States v. Henry*,[24] and *Maine v. Moulton*.[25]

█ In an attempt to clarify the application of the federal exclusionary rule in this case, I believe it is necessary to expand somewhat upon the Rhode Island Supreme Court's analysis. The underlying principle embodied in the Sixth Amendment and explicated in the cited Supreme Court cases is that an accused, in certain circumstances, has the right to confer with counsel before undergoing a police interrogation. As the Court observed in *Moulton*, "[t]he Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State.... this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right."[26]

█ In order to deter police officers from denying an accused this right, the Court has used the exclusionary rule to suppress any evidence gained from an illegal interrogation where the access to counsel was not properly afforded.[27] The rule also

24. 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

25. 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

26. 474 U.S. at 176, 106 S.Ct. at 487.

27. The Court's specific holding regarding the exclusionary rule in *Massiah* (where the police asserted an alternative legitimate purpose for the investigation), which was quoted and affirmed in *Moulton*, was that:

> We do not question in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. *All that we hold is that the defendant's own incriminating statement, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial.*

extends beyond the direct products of police misconduct to bar evidence derived from the illegal conduct, or "fruit of the poisonous tree."[28] Examples of such "fruit" include physical evidence or in court witness testimony which the prosecutor was able to procure because of the information gained in an illegal interrogation. The Supreme Court has emphasized, however, that the exclusionary rule "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons."[29] Rather, "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not infringe on competing interests."[30]

█ The facts of this case are readily distinguishable from *Massiah* and its progeny. The distinctions are at one and the same time critical and fatal to Burke's petition: (1) Ms. Lamoureux accused the defendant of making an implicit threat to harm her; (2) The police offered a facially legitimate reason for placing a bodywire on Ms. Lamoureux—investigation of possible witness tampering and protection of Ms. Lamoureux; (3) The allegedly incriminating testimony introduced at trial concerned *only* Burke's affirmative attempt to bribe Ms. Lamoureux, rather than statements made by Burke about his involvement in the original crime.[31] Although these

Massiah, 377 U.S. at 206, 84 S.Ct. at 1203; Moulton, 474 U.S. at 174, 106 S.Ct. at 486. (emphasis added).

28. *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

29. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

30. *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981).

31. *See* Trial Transcript, reprinted *supra*. Burke's main objection to Lamoureux's trial testimony is that her accounts of Burke's *attempt to bribe her* are incriminating. Moreover, Burke's responses to questions consist of *denials* of any participation in the crime. Also, I have reviewed Ms. Lamoureux's testimony about Burke's responses to her, and have determined they were of little significance to the jury. If admission of these allegedly "incriminating" responses violated

actions might be considered "incriminating" by a jury, *they were not the consequence of the alleged unconstitutional "interrogation" performed by Ms. Lamoureux as an agent for the Woonsocket Police; rather, they sprung from Burke's own wrongful initiative.* As discussed below, the Sixth Amendment does not protect this wrongful initiative. (4) Lamoureux's testimony about Burke's initiative was independently admissible as reflecting on Burke's consciousness of his guilt.

▇▇ The crux of this case is that the prosecution did not offer evidence which sprang from an interrogation conducted by Ms. Lamoureux; rather, the prosecution offered evidence which reflected Burke's independently admissible (illegal) attempts to prevent Ms. Lamoureux from testifying.[32] In this regard, he is not entitled to Sixth Amendment protection. As the Court noted in *Nix v. Whiteside*, "if defendants ... had communicated to their respective counsel their plan to tamper with or intimidate a witness, they would have been entitled neither to counsel's assistance nor silence."[33]

Burke argues that *Massiah, Henry,* and *Moulton* dictate a different result. In *Massiah* and *Henry,* the Court held that because the codefendant or informant had done more than passively listen, the defendant's Constitutional rights were violated.[34] In *Moulton,* the Court held that evidence of incriminatory statements concerning the offenses for which defendant was being tried will be excluded, even though the accused had initiated the conversations, and even though the police alleged an alterative legitimate reason for the investigation such as witness tampering.[35]

In agreement with the Rhode Island Supreme Court majority,[36] however, I believe that these cases are not dispositive. In none of these cases did the independently relevant and admissible evidence introduced at trial concern *only* witness tampering. On the contrary, the holdings in *Massiah, Henry* and *Moulton* were limited to application of the exclusionary rule to the accused's statements *about the original crime* for which they were charged.

▇▇ The objectionable, incriminating testimony admitted in the instant case con-

---

Burke's Sixth Amendment rights, they would clearly fall within the harmless error analysis discussed below.

**32.** The majority of the Rhode Island Supreme Court pointed out:

It should be noted that no information was obtained from Crosby save his assistance in beckoning to defendant Burke. No information was obtained from Burke except his consciousness of guilt by offering to bribe Ms. Lamoureux to forget that she heard his voice during the commission of the crime. This was a classic case of tampering with a witness. 529 A.2d at 626.

**33.** Witness tampering, like planning to utilize perjured testimony, is not a matter in which counsel may be called upon to assist. *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Witness tampering like perjured testimony tends to subvert the entire judicial process and its principal function of ascertainment of the truth. When a defendant in a criminal case chooses to subvert this process, which is at the core of all liberties, he may forfeit otherwise applicable constitutional safeguards. *See Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). Unfortunately for the defendants in this case, testimony concerning Burke's witness tam-

pering was clearly admissible and relevant to show the defendants' consciousness of guilt.

**34.** *Cf. Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (the mere passive listening by a cellmate, without more, did not violate the Sixth Amendment right to counsel).

**35.** In *Moulton,* police equipped codefendant Colson with a body wire transmitter to record the conversation at the meeting between Moulton and Colson. During the meeting, Colson elicited incriminating statements from Moulton who provided details of the original crime. At trial, the trial judge admitted the recordings into evidence based on his finding that the recordings had been made to gather information concerning the threats Colson had been receiving. The Supreme Court reversed, reasoning that "[t]o allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right ..." 474 U.S. 159, 180, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985).

**36.** *See Burke,* 529 A.2d at 626 & n. 1.

cerned only a direct attempt by a defendant to persuade a prosecution witness not to testify.[37] Such evidence is independently relevant and admissible on the central question in Burke's criminal trial—whether he believed he was guilty of the charged robbery. As discussed *supra*, Burke is not entitled to Sixth Amendment protections for such conduct.[38] Accordingly, I find no Constitutional error in the admission of Ms. Lamoureux's testimony in Burke's criminal trial.

### b. *Harmless Error*

 Even if petitioner proved a Constitutional violation due to the admission of Ms. Lamoureux's testimony[39] there was an overwhelming amount of reliable, incriminating evidence admitted at trial which would render any error harmless.[40] The harmless error rule is generally stated "that if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict, the error is harmless and the verdict may stand."[41]

In addition to the challenged testimony of Denise Lamoureux, there was her unchallenged testimony that Ms. Lamoureux knew William Burke and recognized his voice as that of the robber acting as lookout during the robbery, and that she saw his illumined profile and recognized certain of his mannerisms as well. Judith Valois, the bartender on duty at the time, testified she also knew and recognized Burke's voice. In addition to

that, there was testimony that Burke had been in the bar the previous Wednesday, and had "just leaned back at one point and looked around the room and said, 'This would be a great place to hit.'" Another witness, Helen Fountaine, also overheard the statement, and Burke introduced to her a man with him that night, Kelly Crosby.

Added to this was the testimony of John Eddy, that he was present during a conversation between the defendants after their arrest, in which Crosby asked Burke why he left without him and Burke explained he thought Crosby was "right behind" him, adding, "I wasn't driving anyway, so it was really nothing I could do about it." Eddy testified that he was incarcerated awaiting release from the Intake Service Center at the ACI in December of 1982 when Crosby approached and asked Eddy to "do him a favor" and "pick something up and get rid of it." Eddy said Crosby went on to explain the robbery and his own participation in it, and he told Eddy he had left items "behind at a garage" afterward, that included clothing Crosby said he wore during the robbery.

According to Eddy, both defendants came over to him a couple of weeks after that and reiterated to him how to find the place, and Burke told Eddy to make sure he did it at night, "because there are houses in the area." Eddy testified that during that conversation, Crosby told Burke "how he got away": "He

---

**37.** *See* Ms. Lamoureux's testimony, *supra*.

**38.** *See also Grieco v. Meachum*, 533 F.2d 713, 717–719 (1st Cir.1976), *cert. denied sub. nom Cassesso v. Meachum*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976). In *Meachum*, the First Circuit held that an indicted defendant's post-indictment incriminating statements, which were the subject of a co-defendant's testimony at a joint trial, were admissible without violating the Sixth Amendment because they formed the basis of the separate, unrelated crime of subordination of perjury. *Id.* at 718. I do not believe that *Moulton* overruled *Grieco*.

**39.** Burke might argue under *Moulton* that the statements he made in Lamoureux's presence besides those relating to his attempts to bribe her would be excludable under the Sixth Amendment. One example might be his statement that "the people who [robbed the bar] were looking for thousands of dollars of cocaine which "Red" Delaurier had...." *See* Trial Testimony reprinted *supra*. Notably, however, the salient theme

from Lamoureux's testimony was Burke's *denial* of involvement in the robbery. Therefore, even if Burke could prove it was Constitutional error not to exclude the statements, the harmless error analysis would apply.

**40.** *See, e.g., Satterwhite v. Texas*, 486 U.S. 249, 257, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988) (where effect of the Sixth Amendment violation is limited to erroneous admission of particular evidence at trial, harmless-error analysis applies); *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), *cited in Satterwhite* (admission of confession obtained in violation of *Massiah* held harmless beyond a reasonable doubt).

**41.** *Satterwhite v. Texas*, 486 U.S. at 256, 108 S.Ct. at 1797 (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

said that he ran across the street to the Hillside Lounge and ran around it and through some trees and by an apartment which led him over to the garage, behind the garage where he left the clothing."

Upon release, *Eddy took the police to the location, and the items were found as described,* including a Cross pen bearing the name "Judie Valois" and a pocketbook conclusively identified by Ms. Valois from photographs at the trial. Scalp hairs removed from Crosby were microscopically compared to human head hairs taken from a woman's stocking behind the garage and were found to be similar.

Thus, even assuming *arguendo,* that a Constitutional violation occurred in the admission of Ms. Lamoureux's testimony, I find that the prosecution has proved beyond any reasonable doubt that the admission of this testimony did not affect the jury in the determination of its verdict.

2. *The "Lost Evidence Claim"*

Petitioner's second claim involves the clothing claimed to have been worn by Crosby during the robbery and left at the nearby garage as Crosby fled the scene. As the Rhode Island Supreme Court noted, this evidence had been available for admission at the first trial, in September 1984, which ended in the declaration of a mistrial.[42] Thereafter, the evidence was placed in an evidence locker at Cumberland Police Headquarters, but evidently became hidden by other evidence stored on top of it within the ensuing months; when the case next came to trial in June of 1985, it could not be found. Consequently, previously taken black-and-white photographs of the lost items were admitted in evidence at trial *without objection.*

The trial concluded with the defendants conviction. Motions for a new trial were denied October 4, 1985, and the defendants appealed on other grounds. Approximately one month later, during the pendency of the defendants' appeal, the state notified both defendants that the physical evidence had been located by the Cumberland police on October 31, 1985, while they were transferring evidence to a new evidence locker. On March 25, 1986, six months later, counsel for petitioner Burke viewed the tangible evidence and thereafter both defendants moved for a new trial on the ground of newly discovered evidence. On remand to the Superior Court, the motions were denied and the Supreme Court affirmed that ruling on appeal.[43]

■ Petitioner claims that somehow the prosecution's actions infringed on his federal right to disclosure of "evidence favorable to the defense" and amounted to a due process violation under *Brady v. Maryland.* [44] Under *Brady,* however, a Constitutional violation will only be found if the suppressed favorable evidence is "not available to the defense at the time of trial" and the evidence is "material" to the outcome of the trial.[45] The Brady Rule was not designed to punish society for the misdeeds of a prosecutor; rather, it was designed to enhance the fairness of the trial.[46]

■ Petitioner has failed to demonstrate how the (unobjected to) admission of the black and white photographs at trial, which served as a substitute for evidence *favorable to the prosecution,* falls within the definition of "withheld" and "material" evidence under *Brady* and *United States v. Agurs.* [47] First and most importantly, this original evidence was available for inspection to the petitioner [48] and *petitioner failed to object to the admission of the black and white photo-*

42. *State v. Burke,* 559 A.2d at 1063.

43. *Id.* at 1064.

44. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

45. 373 U.S. at 87, 83 S.Ct. at 1196.

46. *Id.*

47. 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Agurs,* the Court explained that the

proper standard of materiality as established by *Brady* is whether the suppressed evidence might have created a reasonable doubt that did not otherwise exist. *Id.* at 112, 96 S.Ct. at 2401.

48. On April 7, 1983 the State supplied to Burke the police report and affidavit detailing the items found behind the garage on January 28, 1983, and its request for laboratory comparison of hair samples taken from Crosby with any hairs found in the "ski toke" and nylon stocking found there. The State invited the defense to "contact the undersigned to schedule an appointment to view

*graphs which were offered as a substitute.*[49] Second, the original evidence was a *prosecution* exhibit which was *incriminating* rather than *exculpatory,* and therefore not material to the petitioner. Petitioner has offered no convincing scenario explaining how he would have been assisted in his defense by the clothing's presence.[50] The only party which conceivably might have been hampered by the clothing's absence was the State. The clothing's absence did not detract in the least from the fairness of Burke's trial.

### Conclusion

Based on the forgoing analysis, I recommend that the petition be denied.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.[51] Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court.[52]

April 12, 1993

tangible evidence." At no point thereafter, either before the first trial, or before the second, did either defendant attempt a view.

49. *State v. Burke,* 559 A.2d at 1063.

50. Petitioner offers a number of arguments that the availability of the evidence at the trial would have been material to the outcome. After review of these arguments, I find that none of them are meritorious, especially in light of petitioner's failure to object to the admission of the black and

white photographs. For a thorough discussion of the materiality of this "new evidence," see Judge Bourcier's Amended Decision (April 5, 1988) and *State v. Burke,* 559 A.2d at 1062.

51. Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b).

52. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).